**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ACADIA PHARMACEUTICALS INC., | |
| Plaintiff, | C.A. No. 1:20-cv-00985-RGA |
| v. | CONSOLIDATED |
| AUROBINDO PHARMA LIMITED, et al., | |
| Defendants. | |

**JOINT CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

Page

**PLAINTIFF'S OPENING POSITION** ...........................................................................1

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND ...........................................................................................2

III.    THE LEGAL STANDARDS FOR CLAIM CONSTRUCTION ...........................4

IV.    THE DISPUTED CLAIM TERMS ...............................................................6

       A.    "40 mg granulated pimavanserin tartrate" ...........................................6

           1.    ACADIA's Construction Is Consistent with the Claims ...........................6

           2.    The Patentee's Definitions and Other Guidance in the Specification Support ACADIA's Construction ...........................................8

           3.    The Prosecution History Further Supports ACADIA's Construction .......12

           4.    Defendants' Construction Is Contrary to the Intrinsic Record and Should Be Rejected ...........................................14

       B.    "the granulated pimavanserin tartrate" ...........................................16

       C.    "the granulated pimavanserin" ...........................................................17

       D.    "granulated pimavanserin or a pharmaceutically acceptable salt thereof" ...........18

       E.    "the bulk density of the pimavanserin tartrate" ...........................................18

V.      CONCLUSION ...........................................................................................19

**DEFENDANTS' ANSWERING POSITION** ...........................................................20

I.      INTRODUCTION ...........................................................................................20

II.     LEGAL STANDARDS ...........................................................................................21

III.    DISPUTED CLAIM TERMS ...........................................................................................24

       A.    "granulated pimavanserin tartrate" ('185 patent, claim 1; '480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1) ...........................................24

           1.    Acadia's Prosecution History Disclaimer ...........................................24

           2.    The Claim Language Supports Defendants' Construction ...........................31

           3.    The Specification Supports Defendants' Construction ...........................35

           4.    Defendants' Construction Does Not Limit the Method of Granulating. ...40

       B.    "the granulated pimavanserin tartrate" ('480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1) ...........................................42

       C.    "the bulk density of the pimavanserin tartrate" ('185 patent, claim 3) ...........42

IV.     CONCLUSION ...........................................................................................43

## TABLE OF CONTENTS
### (Continued)

Page

**PLAINTIFF'S REPLY POSITION** ................................................................**44**

I.      INTRODUCTION ....................................................................................44

II.     ACADIA'S CONSTRUCTIONS SHOULD BE ADOPTED ..........................45

      A.    "40 mg granulated pimavanserin tartrate" ...........................................45

            1.    ACADIA Did Not "Clearly and Unmistakably" Disclaim Pimavanserin Granulations with Excipients ...............................................45

            2.    Defendants Selectively Interpret the Specification....................58

            3.    Claim Differentiation Supports ACADIA's Proposed Construction.........61

            4.    The Claims Allow "40 mg Granulated Pimavanserin Tartrate" to Contain Excipients ...............................................................64

      B.    "the granulated pimavanserin tartrate" // "the granulated pimavanserin" // "granulated pimavanserin or a pharmaceutically acceptable salt thereof" ............67

      C.    "the bulk density of the pimavanserin tartrate" ...................................67

III.    CONCLUSION.......................................................................................67

**DEFENDANTS' SUR-REPLY POSITION**.................................................**68**

I.      INTRODUCTION ....................................................................................68

II.     DEFENDANTS' PROPOSED CONSTRUCTIONS ARE CONSISTENT WITH THE INTRINSIC EVIDENCE, INCLUDING THE PATENTEES' DISCLAIMER...........................69

      A.    "granulated pimavanserin tartrate"  ('185 patent, claim 1; '480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1) .................................................69

            1.    Acadia's Prosecution History Disclaimer .................................69

            2.    Defendants' Construction is Consistent with the Claim Language ...........78

            3.    The Specification Describes Granulating Pimavanserin Alone................81

            4.    Defendants' Construction Does Not Limit the Method of Granulating ....82

      B.    "the granulated pimavanserin tartrate" ('480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1)..................................................................83

      C.    "the bulk density of the pimavanserin tartrate" ('185 patent, claim 3)..................84

III.    CONCLUSION.......................................................................................84

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007)...................................................................................... 73

*Asylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017)...................................................................................... 23

*Baran v. Med. Device Techs., Inc.*,
    616 F.3d 1309 (Fed. Cir. 2010)...................................................................................... 39

*Beachcombers v. WildeWood Creative Prods., Inc.*,
    31 F.3d 1154 (Fed. Cir. 1994)......................................................................................... 7

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
    713 F.3d 1090 (Fed. Cir. 2013).............................................................. 22, 39, 41, 80

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008).............................................................. 22, 28, 55, 76

*Cont'l Circuits LLC v. Intel Corp.*,
    915 F.3d 788 (Fed. Cir. 2019)................................................................................. 6, 16

*David Netzer Consulting Eng'r LLC v. Shell Oil Co.*,
    824 F.3d 989 (Fed. Cir. 2016).............................................................................. 28, 55, 56

*Delcor Asset Corp. v. Glenmark Pharms., Inc.*,
    No. 17-1653-RGA, 2018 WL 5630451 (D. Del. Oct. 31, 2018) ............................... 18

*Ecolab Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009)...................................................................................... 45

*Ekchian v. Home Depot, Inc.*,
    104 F.3d 1299 (Fed. Cir. 1997)...................................................................................... 22

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
    508 F.3d 1366 (Fed. Cir. 2007)...................................................................................... 45

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999)........................................................................................ 22

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006)...................................................................................... 17

*E-Pass Techs., Inc. v. 3Com Corp.*,
    473 F.3d 1213 (Fed. Cir. 2007)........................................................................................ 5

*Hakim v. Cannon Avent Grp., PLC*,
    479 F.3d 1313 (Fed. Cir. 2007)............................................................................ 23, 29, 70

*Heuft Systemtechnik GMBH v. Indus. Dynamics Co.*,
    282 F. App'x 836 (Fed. Cir. 2008) ................................................................................. 22

*Hill-Rom Servs. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)................................................................................ 15, 16

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
  222 F.3d 951 (Fed. Cir. 2000) ........................................................................ 22

*Intamin Ltd. v. Magnetar Techs., Corp.*,
  483 F.3d 1328 (Fed. Cir. 2007) ........................................................................ 7

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
  690 F.3d 1318 (Fed. Cir. 2012) ........................................................... 63, 79, 80

*Inventio AG v. ThyssenKrupp Elevator Am. Corp.*,
  5 F. Supp. 3d 665 (D. Del. 2013) .................................................................... 18

*Jonsson v. Stanley Works*,
  903 F.2d 812 (Fed. Cir. 1990) ........................................................................ 22

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
  545 F.3d 1340 (Fed. Cir. 2008) ........................................................................ 5

*Laitram Corp. v. Morehouse Indus., Inc.*,
  143 F.3d 1456 (Fed. Cir. 1998) ...................................................................... 76

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1049 (Fed. Cir. 2009) ........................................................................ 5

*Mass. Inst. of Tech. v. Shire Pharm., Inc.*,
  839 F.3d 1111 (Fed. Cir. 2016) ........................................................... 45, 46, 51

*MAZ Encryption Techs., LLC v. Lenovo (U.S.) Inc.*,
  No. 13-303-LPS, 2015 WL 4035049 (D. Del. Jun. 30, 2015) .......................... 65

*Merck & Co. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) ...................................................................... 33

*Merck Sharp & Dohme Corp v. Fresenius Kabi USA, LLC*,
  No. 14-cv-4989, 2015 U.S. Dist. LEXIS 148064 (D.N.J. Oct. 30, 2015) .......... 66

*Microsoft Corp v. Geotag, Inc.*,
  No. 11-175-RGA, 2013 WL 1868125 (D. Del. May 3, 2013) .......................... 14

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
  215 F.3d 1281 (Fed. Cir. 2000) ................................................................ 46, 51

*Nichia Corp. v. Global Value Lighting, LLC*,
  No. 19-1388-RGA, 2020 WL 6318688 (D. Del. Oct. 28, 2020) ........................ 6

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) ...................................................................... 23

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................................... *passim*

*Poly-America, L.P., v. API Indus., Inc.*,
  839 F.3d 1131 (Fed. Cir. 2016) ...................................................................... 27

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) ...................................................................... 33

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)................................................................ 28, 54, 55

*Rembrandt Pat. Innovations, LLC v. Apple, Inc.*,
    716 F. App'x 965 (Fed. Cir. 2017) ...................................................................... 27

*RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*,
    342 F. App'x 628 (Fed. Cir. 2009) ...................................................................... 22

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002)............................................................................ 81

*Rolls-Royce, PLC v. United Techs. Corp.*,
    603 F.3d 1325 (Fed. Cir. 2010)............................................................................ 39

*Sanofi-Aventis U.S. LLC v. Merck Sharp & Dohme Corp.*,
    No. 16-812-RGA, 2018 WL 389183 (D. Del. Jan. 12, 2018)................................ 15

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
    607 F.3d 784 (Fed. Cir. 2010)................................................................................ 5

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995).............................................................................. 23

*SpeedTrack, Inc. v. Amazon.com*,
    998 F.3d 1373 (Fed. Cir. 2021)...................................................................... 23, 25

*Techtronic Indus. Co. Ltd. v. Int'l Trade Comm'n*,
    944 F.3d 901 (Fed. Cir. 2019).............................................................................. 22

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008)............................................................................ 39

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012)............................................................................ 48

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)............................................................................ 15

*ZMI Corp. v. Cardiac Resuscitator Corp.*,
    844 F.2d 1576 (Fed. Cir. 1988)............................................................................ 22

## TABLE OF EXHIBITS

| Exhibit | Document |
|---|---|
| 1 | NUPLAZID® Product Information |
| 2 | NUPLAZID® Prescribing Label 2016 |
| 3 | NUPLAZID® Prescribing Label 2018 |
| 4 | USP<616> (Bulk density measurement) |
| 5 | Declaration of R. Christian Moreton, Ph.D. in Support of Defendants' Answering Claim Construction Brief |
| 6 | Curriculum Vitae for Richard Christian Moreton *[attached to the Declaration of R. Christian Moreton, Ph.D. in Support of Defendants' Answering Claim Construction Brief as Exhibit A]* |
| 7 | USP<1174> (Carr's index measurement) *[attached to the Declaration of R. Christian Moreton, Ph.D. in Support of Defendants' Answering Claim Construction Brief as Exhibit 1]* |
| 8 | Declaration of Alexander M. Klibanov, Ph.D. in Support of Plaintiff's Reply Claim Construction Brief |
| 9 | Curriculum Vitae for Alexander M. Klibanov *[attached to the Declaration of Alexander M. Klibanov, Ph.D. in Support of Plaintiff's Reply Claim Construction Brief as Exhibit A]* |
| 10 | Declaration of R. Christian Moreton, Ph.D. in Support of Defendants' Reply Claim Construction Brief |

## PLAINTIFF'S OPENING POSITION

### I.     INTRODUCTION

ACADIA filed these patent infringement cases under the Hatch-Waxman Act in response to Defendants' filings of Abbreviated New Drug Applications seeking approval to market generic versions of ACADIA's NUPLAZID® ("Nuplazid"), the first and only medication approved by the U.S. Food and Drug Administration ("FDA") for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis. *See, e.g.*, Ex. 1 at 1.[1]  The active ingredient of Nuplazid is pimavanserin, a novel antipsychotic compound.

This *Markman* proceeding concerns terms from three related patents directed to capsule formulations for pimavanserin.  In connection with these patents, Defendants have collectively identified the following terms which still require construction by this Court: "granulated pimavanserin tartrate," "granulated pimavanserin or a pharmaceutically acceptable salt thereof," "the granulated pimavanserin," and "the bulk density of the pimavanserin tartrate."

ACADIA disagrees that constructions are necessary, but offers constructions in light of Defendants' term identifications.  In offering constructions, ACADIA does not separately construe "granulated pimavanserin tartrate," but rather the more complete form of the term as it appears in the claims, "40 mg granulated pimavanserin tartrate."  Since construction of this term represents the bulk of the dispute between the parties, and dictates the construction of "granulated pimavanserin or a pharmaceutically acceptable salt thereof," ACADIA's arguments focus on this term.  The term "the granulated pimavanserin" and a related term identified by ACADIA, "the granulated pimavanserin tartrate," simply concern antecedent reference to an

---

[1]  "Ex. _" refers to exhibits submitted with ACADIA's Opening Claim Construction Brief.

earlier claim element.  The final term, "the bulk density of the pimavanserin tartrate," is not recited in any asserted claim and is not proper for construction.

ACADIA's constructions reflect the plain meanings of the terms in the context of the patents and claims in which they appear.  By contrast, Defendants' constructions conflict with the intrinsic evidence, exclude disclosed embodiments, and improperly import a limitation.

## II.    BACKGROUND

Parkinson's disease psychosis ("PDP") is a debilitating symptom that may appear in Parkinson's disease patients, causing them to experience hallucinations and delusions.  *See, e.g.*, Ex. 2 at 1.  Nuplazid was launched in the United States in 2016 and remains the only FDA-approved medicine to treat PDP-related hallucinations and delusions.  *See, e.g.*, Ex. 1 at 1; Ex. 2 at 1.  Nuplazid was originally launched as a 17 mg tablet formulation, which required PDP patients to take two 17 mg tablets once daily.  *See* Ex. 2 at 1.  Despite the benefits of Nuplazid over the other antipsychotic drugs available at the time, taking two tablets posed significant compliance challenges for elderly/fragile patients who may suffer from pill burden or have difficulty swallowing.  *See, e.g.*, U.S. Patent No. 10,646,480 ("the '480 patent") at 1:34-47. ACADIA then sought to develop a 34 mg formulation for ease of administration and enhanced patient compliance.  *See, e.g.*, Ex. 3 at 1.  ACADIA developed such a formulation and in June 2018 received FDA approval for Nuplazid 34 mg capsules.  *See id.*  Once daily dosing coupled with the small size of Nuplazid 34 mg capsules provides substantial advantages over the prior formulation.  *See, e.g.*, '480 patent at 1:34-47.

Nuplazid 34 mg capsules are protected by several patents in the Orange Book.  A subset of those patents have been asserted against each of Defendants and three are at issue in claim construction: U.S. Patent No. 10,449,185 ("the '185 patent"); the '480 patent; and U.S. Patent No. 10,849,891 ("the '891 patent") ("the asserted formulation patents").  These patents are

directed to pharmaceutically acceptable capsules for orally delivering 34 mg of pimavanserin to a patient in a small capsule by using granulated pimavanserin.  Claims 14 and 20 of the '480 patent and claim 8 of the '891 patent are representative of the terminology at issue here and are copied below with the disputed claim terms italicized.

Independent claim 14 of the '480 patent:

14.  A pharmaceutically acceptable capsule for orally delivering 34 mg of pimavanserin to a patient, wherein the capsule has a size 3 or 4 capsule shell that contains a blended pimavanserin composition comprising:

*40 mg granulated pimavanserin tartrate* wherein the bulk density[2] of *the granulated pimavanserin tartrate* of 0.4 g/ml to 0.6 g/ml as determined by USP<616>, method 1; a filler and optionally a lubricant.

Dependent claim 20 of the '480 patent:

20.  The pharmaceutically acceptable capsule of claim **14,** wherein *the granulated pimavanserin* has a Carr's index[3] of 24 as determined by USP<1174>.

Independent claim 8 of the '891 patent:

8.  A pharmaceutically acceptable capsule for orally delivering 5-34 mg of pimavanserin to a patient, wherein the capsule contains a blended pimavanserin composition comprising:

*granulated pimavanserin or a pharmaceutically acceptable salt thereof*, wherein the bulk density of the *granulated pimavanserin or pharmaceutically acceptable salt thereof* is 0.4 g/ml to 0.6 g/ml as determined by USP<616>, method 1; a filler and optionally a lubricant.

The representative claims require granulated pimavanserin (or a salt thereof), but are not limited to specific granulation processes.  Nor do they require pimavanserin to be "granulated alone."  The asserted formulation patents disclose various embodiments of "granulated

---

[2]  Bulk density is the mass of a solid in a unit volume; the higher the bulk density, the greater amount of solid in the same unit volume.  *See, e.g.*, Ex. 4 at 4.

[3]  Carr's index is a measure of a substance's compressibility.  *See, e.g.*, '480 patent at 10:11-13.

pimavanserin" or "pimavanserin granulation" that appear in the specification of the '480 patent[4]

as interchangeable terms.  *See* '480 patent at 4:55-56 ("[t]he terms 'granulated pimavanserin' and

'pimavanserin granulation' are used interchangeably herein").  For example, Table 2 is entitled

"[c]omposition of [p]imavanserin granulation (34 mg)," and expressly includes 40.0 mg

pimavanserin tartrate,[5] 59.0 mg microcrystalline cellulose, and 1.0 mg magnesium stearate as

"[i]ngredients" in the composition of pimavanserin granulation (34 mg).  *Id.* at 21:10-22.  Other

embodiments describe "pimavanserin tartrate granulation containing" a particular type of

microcrystalline cellulose and colloidal silicon dioxide (*e.g.*, pimavanserin granulated with

excipients).  *See id.* at 17:36-51.  In another embodiment, water is sprayed on pimavanserin

followed by granulation without addition of a binder.  *See id.* at 9:50-56.

ACADIA's inventions enable the full FDA approved dose of pimavanserin to be

encapsulated into a small capsule, thus overcoming the problems associated with prior art

formulations that required significantly higher amounts of excipients, had low amounts of active

ingredient, and a much larger capsule size that, altogether, made them difficult to swallow and

curtailed patient compliance.  *See, e.g.*, *id.* at 1:22-61, 10:4-39.

## III.    THE LEGAL STANDARDS FOR CLAIM CONSTRUCTION

 "It is a bedrock principle of patent law that the claims of a patent define the invention to which

the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.

Cir. 2005) (*en banc*).[6]  Courts "look to the words of the claims themselves to define the scope of

---

[4]  The '185, '480, and '891 patents share a common specification.  For convenience, citation has
been made to the '480 patent specification throughout.

[5]  As noted at the bottom of Table 2, "40 mg pimavanserin tartrate salt is equivalent to 34 mg
pimavanserin free base."  *Id.* at 21:22.

[6]  Unless otherwise indicated, all emphasis has been added, and all internal citations and
quotations have been omitted.

the patented invention." *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1220 (Fed. Cir. 2007).  The words of a claim "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13.

When construing terms, the claim language must be considered in context.  *See, e.g.*, *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole."); *Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive.").  Additionally, "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive . . . ." *Phillips*, 415 F.3d at 1315.

"A construing court's reliance on the specification must not go so far as to import limitations into claims from examples or embodiments appearing only in a patent's written description unless the specification makes clear that the patentee intends for the claims and the embodiments in the specification to be strictly coextensive." *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 792 (Fed. Cir. 2010).  Indeed, the Federal Circuit has "repeatedly held that . . . the claims generally should not be narrowed to cover only the disclosed embodiments or examples in the specification." *See Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1058 (Fed. Cir. 2009).

The prosecution history may also be considered as part of claim construction because it can show "how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.  But "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

## IV.     THE DISPUTED CLAIM TERMS

The core dispute between the parties and across the terms at issue is whether pimavanserin can be granulated in the presence of excipients or whether it must be "granulated alone."  The ordinary meaning and intrinsic record make clear that the former is correct. Defendants seek to add the "granulated alone" limitation in an inappropriate attempt to create a non-infringement claim.

### A.     "40 mg granulated pimavanserin tartrate"
('185 patent, claim 1; '480 patent, claims 1, 5, 12, 14; '891 patent, claim 1)

| ACADIA's Construction | Defendants' Construction |
|---|---|
| "Granulation resulting from an act or process in which particles, including 40 mg pimavanserin tartrate, are made to adhere to form larger, multiparticle entities" | 40 mg pimavanserin tartrate granulated alone |

### 1.     ACADIA's Construction Is Consistent with the Claims

Claim construction begins with the language of the claims.  *Phillips*, 415 F.3d at 1312-14. Here, the claims simply require 40 mg granulated pimavanserin tartrate.  They do not place any limitation on the process by which 40 mg pimavanserin tartrate is granulated and do not exclude processes which granulate 40 mg pimavanserin tartrate with other types of particles.  Thus, without additional claim limitations, one of ordinary skill in the art would have understood the claims to include a broad spectrum of granulations with 40 mg granulated pimavanserin tartrate, including, for example, 40 mg of pimavanserin tartrate granulated with excipients like a binder. *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 800 (Fed. Cir. 2019) (finding district court erred in reading a process limitation into a product claim); *Nichia Corp. v. Global Value Lighting, LLC*, No. 19-1388-RGA, 2020 WL 6318688, at *9 (D. Del. Oct. 28, 2020) ("Without evidence that the process steps of a product claim are an essential part of the claimed invention, the process step should not be read into the claimed invention.").

The fact that the claims are not limited to granulating pimavanserin tartrate "alone" or using any specific process is further supported, *inter alia*, by unasserted dependent claim 13 of the '891 patent (which depends from representative claim 8 of the '891 patent).  Claim 13 specifies the granulation process and excludes the use of a binder during granulation:

> 13.  The pharmaceutically acceptable capsule of claim **8**, wherein the granulated pimavanserin is formed by *wet granulating* native pimavanserin *with water*, and *without addition of a binder*.[7]

Claim 8 of the '891 patent, from which claim 13 depends, is necessarily broader in scope, where (1) granules can be formed by other granulation processes, and (2) *with* addition of a binder (or some other type of excipient), consistent with ACADIA's construction.  *See, e.g.*, *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("An independent claim impliedly embraces more subject matter than its narrower dependent claim.").  Claim 13 of the '891 patent demonstrates that the patentee knew how to limit the granulation process (*e.g.*, wet granulating with water) and exclude excipients during granulation (*e.g.*, without addition of a binder) when intended.  The fact that the patentee did not include such limitations in any of the asserted claims demonstrates a conscious choice that should not now be limited in claim construction.  Also, adopting Defendants' constructions—requiring "pimavanserin tartrate granulated alone"—would render the requirement "without addition of a binder" superfluous, which is contrary to Federal Circuit precedent.  *See, e.g.*, *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1162 (Fed. Cir. 1994) (a claim construction rendering a dependent claim superfluous is presumptively unreasonable).

---

[7]  Independent claim 8, from which claim 13 depends, recites the term "granulated pimavanserin or *a pharmaceutically acceptable salt thereof*" as opposed to "40 mg granulated pimavanserin *tartrate*" (a pharmaceutically acceptable salt).  But in either case, claim 13 supports the fact that references to "granulated pimavanserin" are not limited to any specific granulation process.

### 2. The Patentee's Definitions and Other Guidance in the Specification Support ACADIA's Construction

#### a. The Specification's Definition of Granulation Supports ACADIA's Construction

The specification, which is the single best guide for interpreting claim language, further supports ACADIA's construction. *See Phillips*, 415 F.3d at 1315. ACADIA's construction follows directly from the specification's definition of "granulation."[8] *See* '480 patent at 4:47-63. The specification states that "granulation" refers to "the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules." *Id.* at 4:47-50. Furthermore, "[g]ranules may for example be formed collecting particles together by creating mechanical bonds between them, e.g. by compression or by using a binder." *Id.* at 4:51-53. That large, multiparticle entities called "granules" may be formed by "collecting particles together," including active ingredient and/or excipients as types of particles, is consistent with ACADIA's construction: "Granulation resulting from an act or process in which particles, including 40 mg pimavanserin tartrate, are made to adhere to form larger, multiparticle entities."

The specification explains that "[g]enerally a granulation process combines one or more particles and forms a granule that will allow tableting or the encapsulation process to be within required limits." *Id.* at 4:57-59. In referencing "*one or more* particles" to form granules, the patentee clearly meant *one or more types* of particles. One cannot form a granule by combining one particle—it would still be one particle. Rather, *one type* of particle may be combined on itself to form a granule. *See, e.g.*, *id.* at 9:50-56 (describing process comprising "spraying water to pimavanserin, followed by a granulation process, wherein pimavanserin is granulated without

---

[8] The parties' joint construction of the term "blended pimavanserin composition" similarly follows from the specification's definition of the term "blending." *See* '480 patent at 4:64-5:2; D.I. 125, Ex. 1 at 4.

addition of a binder.").  Alternatively, *more types* of particles, *e.g.*, pimavanserin tartrate, microcrystalline cellulose, and colloidal silicon dioxide, may be combined to form a granule. *See, e.g.*, *id.* at 17:36-51 (describing embodiments of "pimavanserin tartrate granulation").  The specification further notes that granulation is not limited to specific equipment suitable for pimavanserin "granulated alone," but rather "[t]he granulation can be performed in a variety of equipment such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger."  *See id.* at 4:61-63.

### b.    The Specification's Definition of Binder Supports ACADIA's Construction

ACADIA's construction is also supported by the specification's definition of the term "binder," which is "an excipient holding the ingredients together, and *forming granules or tablets with required mechanical strength*, and may give volume to the formulation."  *See* '480 patent at 3:66-4:2.  Indeed, this definition and the examples in the specification support the notion that "granules" may be formed using the active ingredient and other particles (*e.g.*, a binder) as part of a granulation.  *See, e.g.*, *id.* at 12:60-64 ("Some embodiments include a pharmaceutical composition comprising granulated pimavanserin tartrate, Form C which may include a small percentage of Form A, including a pharmaceutically acceptable diluent, binder or excipient, or combination thereof."); 16:6-12 ("As disclosed herein it has been demonstrated that pimavanserin can be granulated without the use of a binder, i.e. utilizing water only.  It is however contemplated that in some embodiments suitable binders, such as cellulose, methyl cellulose, polyvinylpyrrolidone and polyethylene glycol may be used, although not a necessity."); 12:41-43 ("It is however possible to include a binder in the granulation but for various reasons not necessarily preferred.").

### c.   Numerous Embodiments Support ACADIA's Construction

Numerous embodiments in the specification illustrate the scope of the invention and are consistent with ACADIA's construction.  For instance, the specification describes that "[e]mbodiments provided herein relate to oral administration of a capsule comprising pimavanserin granulation."  '480 patent at 8:50-52.  That a capsule may be wholly comprised of pimavanserin granulation including 40 mg of pimavanserin tartrate and excipients accords with, *inter alia*, the exemplary "[c]omposition of [p]imavanserin granulation (34 mg)" in Table 2 comprised of 40.0 mg pimavanserin tartrate, 59.0 mg microcrystalline cellulose, and 1.0 mg magnesium stearate.  *See id.* at 21:10-22; *see also id.* at 22:13-17 ("In some embodiments disclosed herein relate to pimavanserin granulation, e.g. composed as in table 2, having a weight of granulation of 100 mg±7 (average of 20 samples), i.e. the weight relates to the granulation only, i.e. excluding capsule shell weight."); 20:65-21:9; 22:18-28.

Other embodiments described in the specification include "pimavanserin tartrate granulation containing less than 10% w/w Avicel PH302 and colloidal silicon dioxide, . . . blended with less than 60% w/w microcrystalline cellulose, . . . and about 1% w/w magnesium stearate."  *See id.* at 17:36-43; *see also id.* at 17:44-51 (similar embodiment).  This is another example where granulation of the active ingredient contains pimavanserin tartrate and includes excipients, consistent with the specification's permissive definition of granulation.

There are also embodiments formed by a manufacturing process wherein water is sprayed on the active ingredient (*i.e.*, pimavanserin tartrate), and subsequently granulated with the water without addition of a binder.  *See id.* at 9:50-9:56.  While the specification nowhere describes the particular phrase "pimavanserin tartrate granulated alone" as in Defendants' construction, ACADIA believes that Defendants' construction is likely premised on these embodiments

wherein pimavanserin tartrate is granulated on itself in the presence of water and without using

a binder, *i.e.*, according to a particular method of wet granulation.  By contrast, ACADIA's

construction is not limited to a single embodiment or method and covers the disclosed

embodiments, including pimavanserin "granulated alone."

> **d.      The "40 mg" Descriptor Refers to Amount of Active Ingredient Pimavanserin Tartrate**

The "40 mg" descriptor in "40 mg granulated pimavanserin tartrate" would be understood

by a person of ordinary skill in the art to refer to the amount of active ingredient pimavanserin

tartrate.  Such an understanding allows for excipients to be present in the granulation, which is

demonstrated by, *inter alia*, the exemplary "Composition of Pimavanserin granulation (34 mg)"

in Table 2.  *See id.* at 21:10-22.  The bulk densities of this exemplary pimavanserin granulation

and "Native API" are compared in Table 1.  *See id.* at 10:18-27.  These tables are copied below:

| TABLE 1 | | |
|---|---|---|
| | Pimavanserin granulation* | Native API |
| Bulk density (g/ml) according to USP <616> | 0.508  (n = 4) | 0.294  (n = 2) |
| Carr's Index | 24  (n = 4) | 36  (n = 2) |

*final blend as disclosed in the example hereinbelow and in table 2

| TABLE 2 | | |
|---|---|---|
| Composition of Pimavanserin granulation (34 mg) | | |
| Ingredients | Qty (% w/w) | Qty (mg)/dose |
| Pimavanserin Tartrate | 40.0 | 40.0[a] |
| Microcrystalline Cellulose (Avicel PH302, NF, EP) | 59.0 | 59.0 |
| Magnesium Stearate (Vegetable Source, USP, EP) | 1.0 | 1.0 |
| Total | 100.0 | 100.0 |

[a]40 mg pimavanserin tartrate salt is equivalent to 34 mg pimavanserin free base

11

The "34 mg" in "[c]omposition of [p]imavanserin granulation (*34 mg*)" refers to the amount of pimavanserin as opposed to the entire "[p]imavanserin granulation," which weighs 100 mg.  *See* '480 patent at 21:10-22.  Similarly, the "40 mg" in the disputed term "40 mg granulated pimavanserin tartrate" signals the amount of pimavanserin tartrate that, in accordance with ACADIA's construction, is included among particles made to adhere to form larger, multiparticle entities, *i.e.*, granules.  This construction is also consistent with the overall purpose of the invention described in the patents, namely, to fit the full 40 mg dose of pimavanserin tartrate inside of a small-sized capsule.

### 3.     The Prosecution History Further Supports ACADIA's Construction

Multiple exchanges between the applicant and the examiner at the U.S. Patent and Trademark Office reflect an overall understanding that what separates the claimed inventions from the prior art are formulations of enhanced bulk density that enable 40 mg of pimavanserin tartrate to fit inside small capsule shells of size 3 or 4.  The claimed 40 mg *granulated* pimavanserin tartrate may contain, *e.g.*, the active ingredient and excipients in the granulation.

For example, in response to a Non-Final Office Action issued during prosecution of the application leading to the '185 patent, the applicant incorporated in its remarks a "comparative chart" (in fact, an annotated recreation of part of Table 1 from the specification) which the applicant represented "makes clear that the instantly claimed pimavanserin granulation is significantly altered compared to the native API (active pharmaceutical ingredient, e.g., as used in the prior art)."  D.I. 125-5, Ex. E at 6.  This comparative chart is copied below:

|  | Pimavanserin granulation (as e.g., instantly claimed) | Native API (e.g., as used in prior art) |
|---|---|---|
| Bulk density (g/ml) according to USP <616> | 0.508 (n=4) | 0.294 (n=2) |

In providing the above chart, the applicant directed the examiner's attention to "[p]imavanserin granulation (as e.g., instantly claimed)" and Table 1 of the specification. *Id.* Table 1 (provided along with Table 2 on page 11 above) expressly indicates by way of an asterisk that "[p]imavanserin granulation*" refers to "*final blend as disclosed in the example hereinbelow[9] and in [T]able 2." '480 patent at 10:18-27. Table 2 is drawn to the exemplary "[c]omposition of [p]imavanserin granulation (34 mg)" which contains pimavanserin tartrate as well as excipients. *See id.* at 21:10-22. Accordingly, the "[p]imavanserin granulation" which the applicant represented "as e.g., instantly claimed" refers to an entire pimavanserin granulation containing pimavanserin and excipients as "granulated pimavanserin tartrate." The applicant provided similar comparative charts again during prosecution of the applications leading to the '480 and '891 patents. *See* D.I. 125-10, Ex. J at 7; D.I. 125-13, Ex. M at 8.

The examiner's stated reasons for allowing the patents further reflect an understanding that the claimed inventions are concerned with fitting the total daily dose of 40 mg pimavanserin tartrate into a smaller size 3 or 4 capsule and not towards any particular process for granulation or select embodiment. *See, e.g.*, D.I. 125-7, Ex. G at 7 ("The instantly claimed, granulated pimavanserin formulation allows for minimal excipients, and compaction into smaller dosage forms to ease delivery by oral delivery."); D.I. 125-18, Ex. R at 7 ("The instant invention allows

---

[9]  As described above in Section IV.A.2.c, there are numerous embodiments which are described in the specification after Table 1 and support ACADIA's construction.

for more of the active agent to be present in a smaller capsule that is easier to swallow.").  For instance, the examiner focuses on the difference in size between the claimed size 3 and 4 capsules versus larger size 0 capsules of the prior art, as well as the low concentration ("less than 1%") of active ingredient achievable in size 3 capsules of the prior art.  *See, e.g.*, D.I. 125-7, Ex. G at 7.  The examiner does not focus on any particular granulation process (*e.g.*, granulation without added excipients) or embodiments of pimavanserin granulation (*e.g.*, "granulated alone") from the specification as conveying inventiveness over the prior art.[10]

An examiner's statements made during prosecution are pertinent to construing claim terms and can serve as "an example of using the file history to understand the contours of the invention."  *Microsoft Corp v. Geotag, Inc.*, No. 11-175-RGA, 2013 WL 1868125, at *5 (D. Del. May 3, 2013).  The examiner's statements reflect an understanding of "40 mg granulated pimavanserin tartrate" inclusive of the numerous embodiments of the specification. Accordingly, the prosecution history supports ACADIA's construction.

### 4.   Defendants' Construction Is Contrary to the Intrinsic Record and Should Be Rejected

Defendants' construction is contrary to the intrinsic evidence, erroneously imports a limitation, and is contradicted by the claims themselves.  As explained above in Section IV.A.2.a, the definition of the term "granulation" in the specification allows for the combination of one or more types of particles, including excipients such as binders, and does not limit granulation to any particular method.  By requiring 40 mg of granulated pimavanserin tartrate to be "granulated alone," Defendants have chosen not to ground their construction in the patentee's

---

[10]  The examiner's statements in Office Actions alleging that then-pending claims were taught by the prior art similarly did not focus on any particular granulation processes or embodiments. *See, e.g.*, D.I. 125-4, Ex. D at 4-6; D.I. 125-9, Ex. I at 4-8; D.I. 125-12, Ex. L at 4-8.

clear definition of "granulation."  Moreover, ACADIA's construction is consistent with all of the disclosed embodiments.  Defendants, on the other hand, apparently seek to use some embodiments to create limitations that would then improperly exclude other embodiments.  *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.").

> a.    **Defendants' Construction Impermissibly Imports a Limitation into the Claims**

Defendants' construction seeks to impermissibly add a limitation that is absent from the claims themselves.  *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015) ("It is the *claims* . . . which define the scope of the patent right . . . . A court may not import limitations from the written description into the claims.") (emphasis in original); *Sanofi-Aventis U.S. LLC v. Merck Sharp & Dohme Corp.*, No. 16-812-RGA, 2018 WL 389183, at *4 (D. Del. Jan. 12, 2018) ("[I]t is generally improper to import limitations from the specification into the claims.").  Had the patentee wanted to narrow the claims to restrict the scope as Defendants would have it, the patentee would have clearly and unmistakably done so.

> b.    **Defendants' Construction Conflicts with the Claims**

Defendants' construction is problematic and should be rejected because it is at least inconsistent, and in some instances outright contradicted, by the claims.  While Defendants' construction requires "granulated alone," as discussed above in Section IV.A.1, none of the independent claims of the asserted formulation patents recite that the active ingredient must be "granulated alone."  Nor do these claims recite a particular process for forming the 40 mg granulated pimavanserin tartrate.  In addition to these inconsistencies, Defendants' construction is contradicted by claim 13 of the '891 patent, which was discussed above in Section IV.A.1.

### c.   Defendants Have No Basis for Disavowal

ACADIA cannot decipher the basis behind Defendants' unduly limiting construction. To the extent that Defendants' constructions rest on allegations of clear and unmistakable disavowal, they must fail.  "The standard[] for finding disavowal [is] exacting," *Hill-Rom*, 755 F.3d at 1371, and "[t]o disavow claim scope, the specification must contain expressions of manifest exclusion or restriction." *Cont'l Circuits*, 915 F.3d at 797.  Indeed, "to operate as a disclaimer, the statement[s] . . . must be clear and unambiguous, and constitute a clear disavowal of [claim] scope." *Cont'l Circuits*, 915 F.3d at 798.  Here, nothing in the intrinsic record provides clear and unmistakable disavowal.

For at least these reasons, Defendants' construction should be rejected in favor of ACADIA's construction which accords with the intrinsic record.

### B.   "the granulated pimavanserin tartrate"
('480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1)

| ACADIA's Construction | Defendants' Construction |
|---|---|
| The term "the granulated pimavanserin tartrate" refers to the term "40 mg granulated pimavanserin tartrate" which is recited in the same claim or in a parent claim | the pimavanserin tartrate that has been granulated alone |

The parties' claim construction dispute here is narrow.  Both parties appear to agree that "the granulated pimavanserin tartrate" refers to the first occurrence of "granulated pimavanserin tartrate" in the same claim or a parent claim in accordance with the parties' respective constructions for that term.  ACADIA's construction specifically references the more complete term "40 mg granulated pimavanserin tartrate," for which it has offered its construction.

16

### C.   "the granulated pimavanserin"
('185 patent, claim 1; '480 patent, claim 20)

| ACADIA's Construction | Defendants' Construction |
|---|---|
| The term "the granulated pimavanserin" refers to the term "40 mg granulated pimavanserin tartrate" which is recited in the same claim or in a parent claim | the pimavanserin that has been granulated alone |

The parties' dispute here is two-fold.  First, the same dispute as above concerning Defendants' improper addition of "granulated alone."  *See supra* Section IV.A.  Second, whether "the granulated pimavanserin" refers to the "40 mg granulated pimavanserin tartrate" as ACADIA asserts, or some unspecified "pimavanserin" as Defendants appear to assert.  In claim 1 of the '185 patent, the antecedent basis for "the granulated pimavanserin" is clearly the "40 mg granulated pimavanserin tartrate."  *See* '185 patent at 24:22-24.  The relevant section of the claim states: "*40 mg granulated pimavanserin tartrate* having a particle size distribution (D90) of 180 to 340 μm, wherein the bulk density of *the granulated pimavanserin* is 0.4 to 0.6 g/ml." *Id.*  No other type of granulated pimavanserin is recited in the claim; therefore, "the granulated pimavanserin" must reference "40 mg granulated pimavanserin tartrate." *See, e.g.*, *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (concluding that "'anode gel' is by implication the antecedent basis for 'said zinc anode.'").

Similarly, a person of ordinary skill in the art would understand that "40 mg granulated pimavanserin tartrate" is the antecedent basis for "the granulated pimavanserin" in dependent claim 20 of the '480 patent.  As shown in Section II, *supra*, exemplary claim 20 depends from exemplary claim 14 of the '480 patent.  Claim 14 recites the term "40 mg granulated pimavanserin tartrate"—which includes a tartrate salt of the active ingredient pimavanserin— whereas claim 20 recites "the granulated pimavanserin" (not granulated pimavanserin tartrate). The only "granulated pimavanserin" recited in claim 14 is "40 mg granulated pimavanserin

tartrate," which is clearly the antecedent basis for "the granulated pimavanserin" in claim 20. Further, in the context of claim 20 of the '480 patent, it is nonsensical to determine the "Carr's index" of just the pimavanserin in "40 mg granulated pimavanserin tartrate."  Pimavanserin undergoes a chemical reaction to form its tartrate salt before granulation, and is not separately evaluated afterwards.  *See, e.g.*, '480 patent at 2:52-3:7.

Moreover, ACADIA's construction should be adopted as it effectively corrects an obvious error (omitting "tartrate") which is not subject to reasonable debate based on consideration of the intrinsic record.  *See Inventio AG v. ThyssenKrupp Elevator Am. Corp.*, 5 F. Supp. 3d 665, 673 (D. Del. 2013).

   **D.**   **"granulated pimavanserin or a pharmaceutically acceptable salt thereof"**
            ('891 patent, claim 8)

| ACADIA's Construction | Defendants' Construction |
|---|---|
| "Granulation resulting from an act or process in which particles, including pimavanserin or a pharmaceutically acceptable salt thereof, are made to adhere to form larger, multiparticle entities" | pimavanserin or a pharmaceutically acceptable salt granulated alone |

ACADIA's construction mirrors that for "40 mg granulated pimavanserin tartrate" with "40 mg" removed as it is not expressly recited.  *See supra* Section IV.A.

   **E.**   **"the bulk density of the pimavanserin tartrate"**
            ('185 patent, claim 3)

ACADIA has informed Defendants and this Court that claim 3 of the '185 patent is no longer asserted against any Defendant.  *See* D.I. 125, Ex. 2 at 7 n.3.  Accordingly, this term is not proper for construction.  *See Delcor Asset Corp. v. Glenmark Pharms., Inc.*, No. 17-1653-RGA, 2018 WL 5630451, at *4 (D. Del. Oct. 31, 2018) (refusing to construe a claim term that did not appear in any of the asserted claims because doing so would be rendering an advisory opinion).

## V.    CONCLUSION

For the foregoing reasons, ACADIA respectfully requests that the Court adopt its proposed constructions of the disputed claim terms.

## DEFENDANTS' ANSWERING POSITION

### I.     INTRODUCTION

This claim construction dispute centers on whether excipients—ingredients beyond the active pharmaceutical ingredient ("API") pimavanserin tartrate—may or may not be present in the claimed "granulated pimavanserin tartrate" having the required bulk density.  As the patentees explained over and again to the Patent Office when distinguishing the prior art, the claimed "granulated pimavanserin tartrate" refers to (in Acadia's own words) "granulated drug alone."  Ex. H[11] at 5.  Thus, the term should be construed as "pimavanserin tartrate granulated alone," i.e., granules of pimavanserin tartrate that do ***not*** contain anything but the drug.  The same issue is presented for all of the disputed terms.

Throughout the prosecution histories of the relevant patents, Plaintiff Acadia Pharmaceuticals Inc. ("Acadia") repeatedly disclaimed pimavanserin tartrate granules containing additional excipients in order to overcome prior art cited by the patent examiner.  That prior art discloses pimavanserin granules having the same bulk density recited in the asserted claims, but which contain ***excipients*** inside the granules.  Acadia overcame the Patent Office's rejection by explaining that, in contrast to the prior art, the claimed invention does ***not*** contain excipients in its pimavanserin granules, but instead is directed to "granulated drug alone."  Ex. H at 5.  Acadia should be precluded from attempting to recapture claim scope it disclaimed during prosecution to gain allowance of the patents.

The plain language of the claims themselves also augurs against Acadia's litigation-inspired construction.  The asserted independent claims each require excipients to be mixed or

---

[11] Ex. ___ refers to the intrinsic evidence filed on September 10, 2021, as exhibits to the parties' Joint Claim Construction Chart (D.I. 125).  Citations to these exhibits include the cover as page 1.

blended with the "40 mg granulated pimavanserin tartrate" to make up the larger "blended pimavanserin composition"—which Acadia agrees is a separate limitation.  In other words, the excipients in the claimed invention's formulation are present in the broader "composition," and ***not*** in the "granulated pimavanserin" ingredient.  Moreover, there is no dispute that the shared specification of the patents discloses embodiments of pimavanserin tartrate granulated alone.  In fact, the specification identifies only these embodiments as "containing novel elements" and as representing a "surprising finding" that pimavanserin could be granulated "***without*** the addition of a binder."  Ex. B, '480 patent at col. 10 ll. 42, 55-63 (emphasis added).

Because Acadia may not read its claims one way to gain allowance, and then read them another way to assert infringement, the Court should adopt Defendants' construction of the "granulated pimavanserin tartrate" terms as referring to "pimavanserin tartrate granulated alone." Defendants' construction is also supported by the declaration of R. Christian Moreton, Ph.D., an expert with substantial experience working in the pharmaceutical industry and in formulating drug products. Dr. Moreton is a recognized expert in the field of drug design and development, with recognition from the United States Pharmacopeia, membership in the International Steering Committee for the Handbook of Pharmaceutical Excipients, and numerous publications in the field of pharmaceutical formulations.  *See* Declaration of R. Christian Moreton, Ph.D. in Support of Defendants' Answering Claim Construction Brief at ¶¶ 7-12 (hereafter, "Moreton Decl."). Defendants' proposed construction is correct and should be adopted.

## II.   LEGAL STANDARDS

As noted by the Federal Circuit in *Phillips*, "the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc).  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the

inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The amendments made and arguments advanced during the prosecution "constitute[] a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc*., 222 F.3d 951, 957 (Fed. Cir. 2000).

Moreover, "when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (citation omitted). This disavowal "must be clear, but it need not be explicit." *Techtronic Indus. Co. Ltd. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019). Disavowal may also occur "by distinguishing the claimed invention over the prior art." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997). "The prosecution history must be reviewed when interpreting a claim to 'exclude any interpretation' that was 'disclaimed or disavowed during prosecution.'" *RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, 342 F. App'x 628, 630 (Fed. Cir. 2009) (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)) (citing *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008)).

Additionally, "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) (citing *Jonsson v. Stanley Works*, 903 F.2d 812, 817-18 (Fed. Cir. 1990)); s*ee also Heuft Systemtechnik GMBH v. Indus. Dynamics Co.*, 282 F.

App'x 836, 841 (Fed. Cir. 2008) ("It is well-settled that prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications.") (citation and internal quotation marks omitted).  "When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue."  *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007).  Absent a sufficiently clear rescission of any disclaimer made during the prosecution of an earlier related application, the estoppel created by the disclaimer will affect the related child applications.  *See Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1318 (Fed. Cir. 2007) ("Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited.").

"Ultimately, the doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1380 (Fed. Cir. 2021) (quoting *Asylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) and *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

## III.   DISPUTED CLAIM TERMS

### A.   "granulated pimavanserin tartrate"[12]
('185 patent, claim 1; '480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1)

| Defendants' Construction | Acadia's Construction |
|---|---|
| pimavanserin tartrate granulated alone | Granulation resulting from an act or process in which particles, including 40 mg pimavanserin tartrate, are made to adhere to form larger, multiparticulate entities |

### 1.   Acadia's Prosecution History Disclaimer

Acadia distinguished cited prior art during the prosecution histories of the relevant patents to make clear that the granulated pimavanserin of the claimed invention is (unlike the prior art), "pimavanserin alone," "drug alone," or "pimavanserin tartrate itself."   Ex. E at 5 ("high bulk density of the pimavanserin tartrate *itself*" and "drug alone"), 6 ("pimavanserin alone"), 7 ("high density of pimavanserin alone"); Ex. H at 5 ("granulated drug *alone*" twice); Ex. J at 6 ("drug alone" and "high bulk density of pimavanserin itself"), 7 ("*pimavanserin alone*" and "the high bulk density of pimavanserin alone"): Ex. K at 3 ("drug alone"), 4 ("high bulk density of pimavanserin itself" and "*pimavanserin alone*"), 5 ("high density of pimavanserin alone"); Ex. M at 7 ("pimavanserin *alone*"), 8 ("high density of pimavanserin alone"); Ex. O at 5 ("Pimavanserin tartrate *itself* can surprisingly be granulated," "granulated drug *alone*," and "claimed granulated pimavanserin tartrate *alone*"), 6 ("bulk density of pimavanserin tartrate alone"), 8 ("the claimed granulated tartrate bulk density, without other excipients").  Acadia cannot recapture the potential

---

[12] Acadia asserts that the proper phrase for construction is "*40 mg* granulated pimavanserin tartrate."  Defendants disagree that the Court needs to construe the meaning of "40 mg" because its plain and ordinary meaning is clear.  Moreover, the inclusion of "40 mg" in the construed phrase will result in the need to separately construe the phase "the granulated pimavanserin tartrate." Even so, if the Court elects to construe "*40 mg* granulated pimavanserin tartrate," the inclusion of the term "40 mg" would not change the meaning of the remaining phrase "granulated pimavanserin tartrate."

scope of the patents' disclosure in litigation that it disclaimed during prosecution to obtain the patents. *SpeedTrack*, 998 F.3d at 1380.

a)     **Acadia's disclaimer was clear and repeated**

In the very first office action during prosecution of the patents-in-suit, the examiner identified U.S. Patent Publication No. 2007/0264330 (the "'330 Application") as "disclos[ing] an oral formulation comprising pimavanserin tartrate" where "[t]he granulated drug has a bulk density of about 0.56 g/ml." Ex. D at 5. That bulk density of the prior art "granulated drug" falls squarely within the range of the claimed invention here of 0.4 to 0.6 g/ml. Ex. A, '185 patent at claim 1.

Even before Acadia's first written response, the prosecuting attorney and Ravi Tejwani, the first listed inventor, participated in an interview with the examiner, and discussed slides provided by Acadia. *See* Ex. E. at 5 (noting July 23, 2019 interview with the examiner); Ex. H at 2 (identifying presentation as for the July 23 Examiner Interview). Acadia's presentation included the following slide, emphasizing that its claimed "novel granulated pimavanserin" is "granulated drug alone" (as distinguished from the cited prior art):



**Key Inventive Points**

- Pimavanserin tartrate can surprisingly be granulated ( without use of large amounts of excipients, i.e. only water) to achieve:
  a) novel granulated pimavanserin having a high bulk density of 0.4 to 0.6 g/ml of the granulated drug alone;
  b) a particle size distribution of 180 to 340 μm of the granulated drug alone;

- Using the novel granulated pimavanserin tartrate, with 0.4 to 0.6 g/ml bulk density and 180 to 340 μm particle size distribution, the inventive blended pimavanserin compositions have significantly lower weight percentage of excipients as compared to prior art

- Contrast to well-understood formulation art that requires significant amounts of excipients with the active during granulation to achieve a higher density granulation formulation, thus requiring a very large volume of composition to deliver 34 mg of pimavanserin

- The final formulation also includes excipient (e.g., microcrystalline cellulose having high bulk density as in the novel granulated pimavanserin

Ex. H at 5 (highlighting added). As shown in the slide, Acadia explained that the reason for granulating the drug ***alone*** was to increase its bulk density and therefore to ***reduce*** the quantity of

25

excipients that would eventually be used in the final formulation blend.  In other words, the key to Acadia's claimed invention was to granulate the pimavanserin tartrate API alone, which would then allow for "significantly lower weight percentage of excipients" to be added to that granulated API to create the final blended formulation.  *Id.* (emphasis omitted).  That results in the advantage that Acadia touts—the ability to administer the known 34 mg dose of pimavanserin in one pill instead of two.  Pl. Br. at 2.  Acadia went on to argue that the cited prior art example "starts with non-granulated pimavanserin with low density, ***in contrast to the claimed novel granulated pimavanserin***" and provided the following table—a recreation of part of Table 1 in the patent specification:

| | Pimavanserin granulation  (as e.g., instantly claimed) | Native API (e.g., as used in prior art) |
|---|---|---|
| Bulk density (g/ml) according to  USP <616> | 0.508 (n=4) | 0.294 (n=2) |

Ex. H at 6 (emphasis added).  As shown in the table, the bulk density of the prior art's API (referred to as "Native API") is lower than the ***granulated*** API of the claimed invention.  Acadia concluded that: "Achieving the claimed pimavanserin bulk density and particle size, ***without other excipients***, was unpredictable and unexpected."  *Id.* at 9 (emphasis added).  Thus, from the beginning Acadia made clear that its claimed granules having the required bulk density are granules of "drug <u>alone</u>." *Id.* at 5 (emphasis original).

Acadia's characterization of its "invention" as granulated pimavanserin tartrate without excipients continued in its written response to the examiner's office action.  Acadia acknowledged in its response that the cited prior art discloses granules of pimavanserin *and excipients* that "achieve a bulk density of 0.56 []g/mL," but distinguished the prior art because the bulk density disclosed therein is "of a *formulation of pimavanserin (and not pimavanserin alone)*."  Ex. E at 6 (emphasis in original).  Acadia explained further that its "instant claimed invention" centered on

26

obtaining "high bulk density of 0.4 to 0.6 g/mL pimavanserin (*drug alone*) that eases swallowing while delivering a full 34 mg of drug." *Id.* at 5 (emphasis added).  Acadia also asserted that, at the time of the alleged invention, "there was no reasonable expectation … that obtaining such high bulk density of pimavanserin *itself*, to obtain a capsule that includes 34 mg of the drug, was achievable." *Id.* at 5-6 (emphasis added).

Acadia again presented the same "comparative chart" discussed above to highlight the improved bulk density of the "instantly claimed pimavanserin granulation" over the prior art.  *Id.* at 6.  Acadia disparaged the 0.56 g/mL bulk density of granules disclosed in the prior art '330 Application because that number represented the bulk density of "a *formulation of pimavanserin (and not pimavanserin alone)*."  *Id.* (emphasis original); *see Rembrandt Pat. Innovations, LLC v. Apple, Inc.*, 716 F. App'x 965, 972 (Fed. Cir. 2017) (The "understanding of the patent is reinforced by its criticism of prior art . . . 'an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature.'") (quoting *Poly-America, L.P., v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016)).  Instead, Acadia touted the 0.508 g/mL bulk density of its "instantly claimed pimavanserin granulation" over the 0.294 g/mL bulk density of the "native API" used in the prior art '330 Application.  Ex. E at 6.  Acadia also criticized the examiner for failing to make a *prima facie* case of obviousness in part because "there is no finding that [a POSA] would have been motivated . . . to obtain the high density of pimavanserin alone."  *Id.* at 7.

Acadia made similar arguments during the prosecution of the child '480 patent.  *See* Ex. J at 6-7 (arguing that a POSA would not have been motivated by the prior art "to obtain the high density of pimavanserin *alone* having 34 mg pimavanserin") (emphasis added); Ex. M at 8 (same); Ex. N at 3 ("argu[ing] that the claimed compound has a higher bulk density which allows for more

of the drug to be granulated and fit into a smaller space, while the drug of the prior art *requires other ingredients in the granulation* which increases the space required") (emphasis added); Ex. O at 5 (presenting to examiner a slide of "Key Inventive Points" and referring to the "granulated pimavanserin tartrate" as "granulated drug alone" in an effort to overcome obviousness rejections) (emphasis original).  Dr. Moreton agrees that a person of ordinary skill would read Acadia's public statements to the examiner to mean that the claimed granules contain pimavanserin alone.  Moreton Decl. at ¶¶ 2-3.

Each of these statements on their own, and certainly as whole, show that Acadia regarded its "instant claimed invention" as compositions containing granules of pimavanserin tartrate—and only pimavanserin tartrate—with a specific bulk density higher than had been obtained in the prior art.  "[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution.  This may occur, for example, when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art."  *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006); *see also Comp. Docking Station Corp. v. Dell, Inc*., 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("Statements made during prosecution may also affect the scope of the claims. Specifically, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution. A patentee could do so, for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art." (internal citations and quotations omitted)); *David Netzer Consulting Eng'r LLC v. Shell Oil Co*., 824 F.3d 989, 994 (Fed. Cir. 2016) ("Moreover, importantly, the patentee made clear and unmistakable statements in the intrinsic record, distinguishing the claimed invention from and disclaiming conventional extraction methods . . . .").  The representations and disclaimer Acadia made during the prosecution of the

'185 and '480 patents carry forward to the '891 patent, absent a clear rescission.  *See Hakim*, 479 F.3d at 1318.  Acadia cannot provide any rescission in the '891 prosecution history.

In sum, Acadia overcame the examiner's obviousness rejections during prosecution of the patents-in-suit by arguing that the claimed invention was "granulated drug [i.e., pimavanserin tartrate] alone"—essentially the construction proposed by Defendants.  Acadia clearly and unmistakably disavowed the pimavanserin granulations of the prior art because they "require[d] other ingredients in the granulation."  Ex. N at 3.  Acadia now proposes a construction of the disputed claim term that would encompass pimavanserin granulations having any number and amount of other ingredients in the granulation.  Acadia cannot recapture during litigation claim scope that it clearly and unmistakably disavowed during prosecution.

### b)   Acadia did not assert during prosecution that the allegedly novel granules include excipients

Acadia's response to the above statements from the prosecution history is to ignore them, and then to reinterpret the table upon which it relied before the examiner.  Acadia argues that the prosecution history supports its construction because the examiner supposedly understood that "[t]he claimed 40 mg *granulated* pimavanserin tartrate may contain, *e.g.*, the active ingredient and excipients in the granulation."  Pl. Br. at 12 (emphasis original).  But Acadia's only support for this contention is an asterisk in the specification that Acadia omitted from the chart that it submitted to the examiner.  Acadia now argues that "by way of an asterisk," the specification indicates that the pimavanserin granulation of Table 1 contains the entire formulation disclosed in Table 2, including pimavanserin tartrate and excipients.  *Id.* at 13.  That contorted and litigation-inspired interpretation is incorrect.[13]  But if true, Acadia hid this fact from the Patent Office.  Its re-creation

---

[13] The asterisk footnote simply informs the reader that there is a "final blend as disclosed in the example hereinbelow and in table 2."  '480 patent at col. 10 l. 26.  That is in contrast to Table 1,

of Table 1 for the examiner—on which it relied to distinguish its "novel" granules from the excipient-containing granules of the prior art—neither included this asterisk nor advised the examiner of its omission.  Rather, Acadia indicated that Table 1 was merely "shown below for convenience," when in fact Acadia had altered it to omit information now central to its claim construction position.  Ex. E at 6; Ex. J at 7.

Acadia is able to improperly conflate the two bulk densities (pimavanserin granulation and pimavanserin blended composition), in part because the density of the excipients external to the granule can be "matched" to the density of the granule.  *See, e.g.*, '480 patent at col. 12 ll. 28-37 ("bulk density between the API and the diluent and optionally the lubricant are matched, for example granulated pimavanserin having a bulk density above >0.40 g/ml, such as about 0.5 g/ml, and the diluent 0.35-0.46 g/ml.").  The specification also identifies embodiments where *both* the "bulk density of the blended composition" *and* the "bulk density of pimavanserin granulation" fall within the range of "0.4-0.6 g/ml," including the particular value shown in Table 1: "0.508 g/ml." *Id.* at col. 22 ll. 18-28.  The fact that both the granulated pimavanserin and the final blended composition can have similar bulk densities does not change the clear statements Acadia made during the prosecution histories that the claimed granulation contains pimavanserin tartrate alone. *See also* Moreton Decl. at ¶ 78.  Dr. Moreton explains that a "POSA would understand that, to perform such 'matching,' the PSD or bulk density of the API means the PSD or bulk density of the API measured alone, and the PSD or bulk density of an excipient means the PSD or bulk

---

which compares the API of the prior art and the API of the claimed invention (the "Pimavanserin granulation").  And as Acadia concedes, the patent itself makes clear that the terms "pimavanserin granulation" and "granulated pimavanserin" are interchangeable terms, meaning that Table 1 refers to granulated pimavanserin (i.e., the API).  Pl. Br. 3-4; '480 patent at col. 4 ll. 55-56.  If Acadia's interpretation advanced to this Court were correct, Acadia could not have made the arguments to the examiner that it did.

density of the excipient, also measured alone.  There would be nothing to 'match' with each other, if the ingredients were first mixed together and then a property was measured from the blended composition."  *Id.*

There can be no doubt from the prosecution histories and the language of the claims themselves that the bulk density of granulated pimavanserin tartrate is separate from the bulk density of the ***blended*** composition.  Blending (mixing) is not granulation.  Acadia even stated at one point during the prosecution of the '185 patent, "Claim 4 has been amended to recite the high bulk density of the pimavanserin tartrate <u>itself</u>, in addition to claimed high density of the blended composition."  Ex. E at 5 (emphasis in original).  That statement ends the inquiry.  To the extent that the table (Table 1) that Acadia showed the examiner was not referring to drug alone, it is evidence of an intentional misrepresentation to the Patent Office.  But whatever the asterisk means, Acadia told the examiner in no uncertain terms that the prior art '330 Application was distinguishable from the claimed invention because that prior art reported a bulk density in the claimed range "with ~80% excipient, ***not*** a bulk density of ***pimavanserin alone***."  Ex. H at 6 (emphasis added); *see also* Ex. E at 7 (the bulk density of the claimed pimavanserin refers to "pimavanserin alone").

### 2.    The Claim Language Supports Defendants' Construction

Acadia's present assertion that the specification discloses embodiments of the claimed "granulated pimavanserin tartrate" that contain the entire composition (including excipients) is contrary to the plain language of the claims, which include two distinct terms—a "blended pimavanserin composition" and "granulated pimavanserin tartrate."  Acadia attempts to confound the former with the latter.

The claims of the patents themselves demonstrate that the "blended pimavanserin composition" and "granulated pimavanserin tartrate" cannot be the same thing, because every

independent claim requires that the "blended pimavanserin composition" include some excipient beyond "granulated pimavanserin tartrate" as follows:

| Asserted Claim | Relevant Ingredients |
|---|---|
| '185 patent, claim 1 | "a capsule shell size 3 or 4 that encapsulates a **blended pimavanserin composition** comprising:"<br>– "40 mg **granulated pimavanserin tartrate** having a particle size distribution (D90) of 180 to 340 µm, wherein the bulk density of the granulated pimavanserin is 0.4 to 0.6 g/ml as determined by USP<616>, method 1;"<br>– "59 mg **microcrystalline cellulose** having a particle size distribution (D90) of 180 to 340 µm; and"<br>– "1 mg **magnesium stearate**; . . . ." |
| '480 patent, claim 1 | "a size 3 or 4 capsule shell that encapsulates a **blended pimavanserin composition** comprising:"<br>– "40 mg **granulated pimavanserin tartrate** wherein the bulk density of the granulated pimavanserin is 0.4 to 0.6 g/ml as determined by USP<616>, method 1;"<br>– "**microcrystalline cellulose** having a particle size distribution (D90) of 180 to 340 µm; . . . ." |
| '480 patent, claim 5 | "a size 3 or 4 capsule shell that contains a **blended pimavanserin composition** comprising:"<br>– "40 mg **granulated pimavanserin tartrate** wherein the bulk density of the granulated pimavanserin is 0.4 to 0.6 g/ml as determined by USP<616>, method 1; and"<br>– "57-60% w/w **microcrystalline cellulose**." |
| '480 patent, claim 12 | "a size 3 or 4 capsule shell that contains a **blended pimavanserin composition** comprising:"<br>– "40 mg **granulated pimavanserin tartrate** wherein the bulk density of the granulated pimavanserin is 0.4 to 0.6 g/ml as determined by USP<616>, method 1;"<br>– "a **filler** and a **lubricant**, . . . ." |
| '480 patent, claim 14 | "a size 3 or 4 capsule shell that contains a **blended pimavanserin composition** comprising:"<br>– "40 mg **granulated pimavanserin tartrate** wherein the bulk density of the granulated pimavanserin of0.4 to 0.6 g/ml as determined by USP<616>, method 1;"<br>– "a **filler** and optionally a **lubricant**." |

| Asserted Claim | Relevant Ingredients |
|---|---|
| '891 patent, claim 1 | "a size 3 or 4 capsule shell that contains a **blended pimavanserin composition** comprising:"<br>– "40 mg **granulated pimavanserin tartrate** wherein the bulk density of the granulated pimavanserin tartrate is >0.4 g/ml as determined by USP<616>, method 1; and"<br>– "an **excipient**." |

To avoid the discord of arguing both terms in its briefing, Acadia has agreed that the construction of "a blended pimavanserin composition" means "a mixture of pharmaceutical ingredients including pimavanserin or a pharmaceutically acceptable salt thereof and one or more excipients mixed together." D.I. 125, Ex. 1.

Acadia's problem is that, contrary to its arguments here, the composition described in Table 2 of the specification cannot satisfy both the "blended pimavanserin composition" and the "granulated pimavanserin tartrate" elements in the claims—they are distinct elements. *See, e.g.*, Pl. Br. at 13. Were the claimed "granulated pimavanserin tartrate" to contain all of the ingredients in Table 2, adding that granule directly to a capsule shell means that there is no additional excipient added to the "granulated pimavanserin tartrate" to form the claimed "blended pimavanserin composition." This interpretation would render the "blended pimavanserin composition" term— a term present in every asserted independent claim of these patents—meaningless. *See, e.g.*, *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored."). The proper construction is to recognize that the blended composition is made from the granulated API, which is then blended with excipients. The excipients are not "granulated." They are simply blended.

As noted in the chart above, the claims also refer to a specific **amount** of "granulated pimavanserin tartrate"—40 mg.  As the patent explains, 40 mg of pimavanserin tartrate (i.e., a tartrate "salt" of pimavanserin) translates to 34 mg of pimavanserin free base.  '480 patent at col. 1 ll. 22-28, Table 2.  That is the daily dosage of the drug that was established in the prior art, as the patents themselves explain.  '480 patent at col. 1 ll. 22-28.  This lends further weight to Defendants' construction.  The term "40 mg granulated pimavanserin tartrate" refers to the dosage of the API—the drug **alone**.  The weight of the entire composition is much **more** than 40 mg, as various claims themselves make clear (as does Table 2 of the specification).  *See, e.g.*, '185 patent at claim 1 (40 mg granulated API, plus 59 mg microcrystalline cellulose, plus 1 mg magnesium stearate = 100 mg formulation).  Accordingly, the person of ordinary skill would read "40 mg granulated pimavanserin tartrate" to mean 40 mg of granulated API **alone**.

For Acadia's construction to be correct, the term "40 mg granulated pimavanserin tartrate" would have to simultaneously mean 40 mg of pimavanserin tartrate alone[14] (otherwise the 40 mg dose would make no sense), and yet also that excipients are included in the "granulated pimavanserin tartrate" such that the "40 mg" does not actually qualify the "granulated pimavanserin tartrate."  Such a contorted reading is contrary to the plain import of the phrase.  Defendants' proposed construction is the correct one.  In the phrase "40 mg granulated pimavanserin tartrate," the "40 mg" qualifies the "granulated pimavanserin tartrate."  That means 40 mg of the granulated API alone.

---

[14] Acadia does indeed concede that 40 mg refers to the API, pimavanserin tartrate.  *See* Pl. Br. at 11.

### 3.     The Specification Supports Defendants' Construction

#### a)     The specification's description of the alleged invention supports Defendants' construction

The specification summarizes the purportedly surprising or novel aspects of the alleged invention in a manner consistent with how Acadia described its invention to the Patent Office—a process for manufacturing a capsule of pimavanserin wherein the pimavanserin has been granulated with water and ***no excipients***.  The specification states that "it was surprisingly found that a ***100% pimavanserin*** high-shear granulation was possible by using only small water quantities." '480 patent at col. 15 ll. 8-10 (emphasis added).

The specification describes the invention's "novel elements," explaining that "[p]rior to *the surprising finding* that pimavanserin could be successfully wet granulated achieving the targeted imp[ro]ved physical properties (e.g. bulk density) *without the addition of a binder*, and by adding a small . . . amount of water to pimavanserin by spraying, many different granulation methods were contemplated and tested, and some discussed more in detail hereinbelow." *Id.* at col. 10 ll. 40-63 (emphasis added).  This disclosure squares with Acadia's explanation to the examiner.  As Acadia told the Patent Office, the key to the claimed invention, and the reason Acadia was able to formulate 34 mg of pimavanserin into one dosage form (as opposed to the ***two*** pills or larger capsules of the prior art) was to granulate the pimavanserin alone. '480 patent at col. 1 ll. 34-47; Ex. H at 4, 6.  That resulted in a higher bulk density of the pimavanserin API, which in turn resulted in a lower quantity of excipients being needed, which meant a smaller dosage size could be used.

#### b)     The specification describes granulating pimavanserin tartrate alone

The specification repeatedly describes the alleged invention as comprising pimavanserin tartrate granulated alone.  Consistent with statements made in the prosecution history and the

language of the claims, the "Summary" of the invention describes a process for making a blended pimavanserin composition that first provides for granulated pimavanserin tartrate that is granulated alone, and then blended with a filler before being encapsulated:

> Provided herein are also processes for manufacturing a capsule comprising 5-34 mg pimavanserin or a pharmaceutically acceptable salt thereof comprising: adding water to pimavanserin or a pharmaceutically acceptable salt thereof, and *granulating pimavanserin or a pharmaceutically acceptable salt thereof with the water*; controlling the impeller speed and/or amperage; drying *the granulated pimavanserin* or a pharmaceutically acceptable salt thereof; sizing the dried granulated pimavanserin or a pharmaceutically acceptable salt thereof; *blending* the dried and granulated pimavanserin or a pharmaceutically acceptable salt thereof *and one or more filler*; encapsulating the *blended pimavanserin composition* in a capsule of size 3 or 4.

'480 patent at col. 2 ll. 4-16 (emphasis added).

The detailed description of a "Granulation" process also describes granulating pimavanserin tartrate alone.  In particular, the specification describes the following steps under the heading "Granulation":

1.  "The required ingredients for all operations of the entire process are weighed."

2.  The moisture content (dryness by loss-on-drying method) of the pimavanserin is determined.

3.  "Pimavanserin is charged through a screen . . . into a high shear granulator . . . ."

4.  The pimavanserin is "pre-blend[ed] in the high shear granulator."

5.  "[G]ranulation water, e.g. 5-8% w/w/ is sprayed" under certain conditions while granulating at specified impeller speed and chopper speed, and monitoring amperage.

6.  At a specified point ("[w]hen the impeller amperage increases") "the spray of water is stopped and the mixture wet massing for 5 minutes without changing the impeller or chopper speeds."

7.  "Following the 5-minute wet massing, the wet granulation is discharged and placed in a fluid bed dryer," where it is dried under certain conditions until the pimavanserin granules are as dry as they were at the beginning of the process ("at dispensing").

8.  The dried granulation is passed through a screen and "packaged until diluent blending and encapsulation."

'480 patent at col. 20 ll. 20-45.  The process described above results in granules containing only pimavanserin.  Although water is used in the process, the pimavanserin granules are dried to the same level of moisture at which they started.  *Id.* at col. 20 ll 21-25, 40-42.  Thus, no additional water is present in the final pimavanserin granule.  *See* Moreton Decl. at ¶ 77 (explaining that "[t]he presence of water during the granulation process described in the specification—water that is subsequently dried off—results in the final pimavanserin granule being pimavanserin alone.").

The second process, "Diluent Binding" takes the "dried pimavanserin granulation"; blends "the granulation with diluent" (i.e. an excipient); performs a second blending step of that mixture "with lubricant" (another excipient); and fills the final composition into capsules.  '480 patent at col. 20 ll. 46-59.  These same processes of granulation of pimavanserin alone then diluent blending are described in more summary fashion earlier in the specification.  *Id.* at col. 17 ll. 55-64; col. 18 ll. 27-44; Moreton Decl. at ¶¶ 83, 91-92, 94-95.

Acadia argues that Table 2 describes ***granules*** that contain 40 mg pimavanserin, 59 mg microcrystalline cellulose, and 1 mg magnesium stearate (i.e., according to Acadia, the granules contain the entire composition).  Pl. Br. at 10.  However, that is not consistent with the detailed example that precedes it.  Instead, the detailed process refers to first "Granulati[ng]" pimavanserin alone (using water that is then dried away), followed by blending that granulated API with a diluent, and then adding a lubricant.  '480 patent at col. 20 ll. 20-59.  That process is consistent with the materials described in Table 2, and is also consistent with the flow charts in Figures 2 and 3 of the patents.  The microcrystalline cellulose and magnesium stearate described in Table 2 are identified in the patent as being examples of a "[s]uitable diluent" and "suitable lubricant[]," respectively.  *Id.* at col. 11 ll. 56-62.  In other words, Table 2 refers to the entire "composition"

that contains the pimavanserin granulation (i.e., the pimavanserin that has been granulated alone). It is not an identification of the contents of the granules.

The idea that the microcrystalline cellulose and magnesium stearate of Table 2 are not within the pimavanserin tartrate granulation is also consistent with additional embodiment descriptions from the specification:

> One embodiment of the compositions described herein includes pimavanserin tartrate granulation without binder, dried, and *thereafter blended* with less than 60% w/w microcrystalline cellulose such as Avicel PH302 or equivalent microcrystalline cellulose, and about 1% w/w magnesium stearate.

*Id.* at col. 16 ll. 25-30 (emphasis added).

> Provided are also embodiments wherein 34 mg pimavanserin (*granulated*) (equivalent to 40 mg pimavanserin tartrate), microcrystalline cellulose, such as microcrystalline cellulose having a particle size distribution (D90) of 180-340 μm, for example Avicel PH302 or an equivalent microcrystalline cellulose, and/or magnesium stearate, for example vegetable grade *are encapsulated* in a capsule of size 4, for example a two-piece capsule.

*Id.* at col. 19 ll. 38-45 (emphasis added).  The specification is therefore consistent with how the patentees characterized their "instant claimed invention"—that pimavanserin is granulated "alone."

### c)      Other granules described in the specification do not have any effect on Acadia's prosecution history disclaimer

Even if there may be some disclosures in the specification of granules containing both drug and excipient, Defendants' claim construction is still correct.  Acadia asserts the specification discloses embodiments that could be read as containing (1) "pimavanserin tartrate granulation containing less than 10% w/w" of specific excipients (2) "blended with less than 60% w/w microcrystalline cellulose . . . and about 1% w/w magnesium stearate."  Pl. Br. at 10; '480 patent at col. 17 ll. 36-51.

However, regardless of such a disclosure, Acadia disavowed that subject matter during prosecution and cannot reclaim it on the mere basis that it may be described in the specification. *Biogen Idec*, 713 F.3d at 1095 ("[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered."). Moreover, "[i]t is not necessary that each claim read on every embodiment." *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010). In fact, when the disclosed embodiments conflict with the claim language, the "court must not allow the disclosed embodiment to 'outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence.'" *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1334-35 (Fed. Cir. 2010) (quoting *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008)). That is precisely the case here. Even if Acadia can interpret portions of the specification to permit excipients within the API granules, that subject matter was omitted from the claims and disclaimed to avoid the prior art.

> **d)   The specification's generic definitions of "granulation" and "binder" have no bearing on the disputed claim term**

Although Acadia makes much of the specification's definitions of "granulation" and "binder," these generic definitions shed no light on the meaning of the specific term "granulated pimavanserin tartrate." Defendants do not dispute that the term "granulation" may, in the abstract, "refer[] to the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules." '480 patent at col. 4 ll. 47-50. In fact, that is how the patentees explained that they are able to increase the bulk density of the pimavanserin (i.e. by "granulating" it). But that does not mean that Acadia's alleged invention encompasses any and all types of pimavanserin granulations that contain other ingredients. It is true that "*[g]enerally* a

granulation process combines one or more particles and forms a granule." *Id.* at col. 4 ll. 57-58. But that does not answer the question of whether Acadia's granules contain more than just the API. They do not.

Similarly, the term "binder" may refer to "an excipient holding the ingredients together, and forming granules or tablets with required mechanical strength." *Id.* at col. 3 l. 66–col. 4 l. 1. But that has no bearing on whether the claim term "granulated pimavanserin tartrate" covers pimavanserin granules containing a binder. The prosecution history answers that question, and tells the public that granules containing excipients are outside of the scope of the claimed invention (because such granules of pimavanserin with excipient existed in the prior art).

### 4.    Defendants' Construction Does Not Limit the Method of Granulating.

Acadia argues that Defendants are seeking to read a process limitation into a product claim. Pl. Br. at 6-7. Not so. Defendants' construction simply describes what Acadia allegedly invented and claimed—granules of pimavanserin alone. Whether these granules are made by a wet granulation process (described in the specification) with a minimum of water that is then dried away, or by some other method, is of no matter to Defendants' proposed construction.

In fact, other methods of granulating are disclosed in the specification using equipment "such as, but not limited to, low shear, high shear granulators, fluid bed granulator, roller compactor, and slugger." '480 patent at col. 4 ll. 61-63. If these or other granulators and their related processes would result in pimavanserin tartrate granules that contain pimavanserin tartrate alone, those granules would qualify as "pimavanserin tartrate granulated alone." That Acadia may not be aware whether any such methods would actually work, or that such methods were not tested and disclosed in the specification is not relevant to the proper construction here.

Acadia also argues that the doctrine of claim differentiation supports its construction.  Pl. Br. at 7.  That is also not correct.  Acadia asserts that because claim 13 of the '891 patent specifies granules "without addition of a binder," that therefore independent claim 8, from which claim 13 depends, must be able to include a binder.  *Id.*

Even if Acadia's reading of claims 8 and 13 were correct (as explained below, it is not), Acadia's proposed construction would still be inappropriate because, as discussed in Section III.A.1 above, Acadia disclaimed during prosecution granulations in which pimavanserin is not granulated "alone."  *See Biogen Idec*, 713 F.3d at 1097 ("Our cases make clear, however, that where found, prosecution history disclaimer can overcome the presumption of claim differentiation.").

Acadia is also incorrect because the two claims have several differences:

8.    A pharmaceutically acceptable capsule for orally delivering 5-34 mg of pimavanserin to a patient, wherein the capsule contains a blended pimavanserin composition comprising:

granulated pimavanserin *or a pharmaceutically acceptable salt thereof*, wherein the bulk density of the granulated pimavanserin or pharmaceutically acceptable salt thereof is 0.4 g/ml to 0.6 g/ml as determined by USP<616>, method 1;

a filler and optionally a lubricant.

13.   The pharmaceutically acceptable capsule of claim 8, wherein the granulated pimavanserin is formed by *wet granulating native pimavanserin with water*, and without the addition of a binder.

Ex. C, '891 patent at claims 8, 13 (emphasis added).  As Acadia recognizes in a footnote, claim 8 allows salts of pimavanserin, while claim 13 does not.  Pl.'s Br. at 7, n7.  Also, as explained above, claim 8 would allow any process of making pimavanserin tartrate granules, i.e., pimavanserin tartrate granulated alone, while claim 13 requires the specific wet granulation method highlighted in the specification—"wet granulating native pimavanserin with water, and without the addition

of a binder." '891 patent at claim 13.  There is no inconsistency and Defendants' construction satisfies the principle of claim differentiation, contrary to Acadia's assertion.

*      *      *

For all of these reasons, the Court should construe "granulated pimavanserin tartrate" as "pimavanserin tartrate granulated alone."

**B.    "the granulated pimavanserin tartrate"**
('480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1)

**"the granulated pimavanserin"**
('185 patent, claim 1; '480 patent, claim 20)

**"granulated pimavanserin or a pharmaceutically acceptable salt thereof"**
('891 patent, claim 8)

For the reasons discussed above with respect to the disputed term "granulated pimavanserin tartrate," Defendants respectfully request that the Court adopt their proposed constructions of these disputed claim terms as follows:

| Disputed Claim Term | Defendants' Proposed Construction |
| --- | --- |
| the granulated pimavanserin tartrate | the pimavanserin tartrate that has been granulated alone |
| the granulated pimavanserin | the pimavanserin that has been granulated alone |
| granulated pimavanserin or a pharmaceutically acceptable salt thereof | pimavanserin or a pharmaceutically acceptable salt granulated alone |

**C.    "the bulk density of the pimavanserin tartrate"**
('185 patent, claim 3)

As mentioned in the parties' Joint Claim Construction Chart (D.I. 125), the parties are working on the formal documents to reflect that claims 3-5 of the '185 patent are no longer asserted against any Defendant.  However, several Defendants have pending counterclaims that still place the '185 patent at issue, regardless of Acadia's agreement not to assert these claims.  Therefore,

absent a stipulation that formally removes these claims from the case, the "bulk density of the pimavanserin tartrate" should be construed to mean: "the bulk density as measured on the pimavanserin tartrate alone."  Unlike the "granulated pimavanserin tartrate" terms discussed above, this claim term has no reference to granulation.  Thus, the plain and ordinary meaning of "the bulk density of the pimavanserin tartrate" refers to pimavanserin tartrate alone.  Of course, this construction is also fully consistent with the discussion above, and Acadia's disclaimer to the Patent Office.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt their proposed constructions of the disputed claim terms.

## PLAINTIFF'S REPLY POSITION

### I.    INTRODUCTION

As detailed in ACADIA's Opening Brief, the claims and specification make it clear that the disputed claims are not limited to pimavanserin granulated alone.  *See* Pl. Op. Br. at 6–12.[15] The claims do not place any limitation on the granulation process.  Defendants do not and cannot dispute that the specification expressly defines "granulation" as "the act or process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules," and further provides that "[g]ranules may for example be formed collecting particles together by . . . ***using a binder***."  '480 patent at 4:47–53.[16]  "Binder" is defined as "an excipient holding the ingredients together, ***and forming granules*** or tablets with required mechanical strength."  *Id.* at 3:66–4:1.  Defendants also cannot dispute that claim differentiation is consistent with ACADIA's proposed construction, including a dependent claim which recites precisely what Defendants seek to read into an independent claim, *i.e.*, granulation without the addition of a binder.  There are also numerous disclosed embodiments wherein pimavanserin granulations include excipients, which would be improperly excluded under Defendants' construction.

Against this overwhelming evidence, Defendants resort to a ninety-seven paragraph expert declaration (extrinsic evidence) arguing an allegedly "clear and unmistakable" disclaimer, and selectively cite and take inconsistent positions with the intrinsic record to arrive at their proposed

---

[15] Abbreviations used: "Pl. Op. Br." (ACADIA's Opening Brief); "Def. Resp. Br." (Defendants' Responsive Brief); "Moreton Decl." (Declaration of R. Christian Moreton, Ph.D. filed with Defendant's Responsive Brief); and "Klibanov Decl." (Declaration of Alexander M. Klibanov, Ph.D. filed with ACADIA's Reply Brief).  While ACADIA submits that expert testimony is not needed for construction here, an assessment of the entire prosecution history by ACADIA's expert Dr. Klibanov shows that a person of skill in the art ("POSA") would not have understood the claims as limited to pimavanserin granulated alone.

[16] Unless otherwise indicated, all emphasis has been added, and all internal citations and quotations have been omitted.

construction.  An examination of the record as a whole reveals that ACADIA described different embodiments of the invention, including pimavanserin granulated with excipients and pimavanserin granulated alone.  Defendants' arguments fail to meet the strict standard of showing that ACADIA clearly and unmistakably limited the invention to pimavanserin granulated alone.

## II.   ACADIA'S CONSTRUCTIONS SHOULD BE ADOPTED

### A.   "40 mg granulated pimavanserin tartrate"
('185 patent, claim 1; '480 patent, claims 1, 5, 12, 14; '891 patent, claim 1)

#### 1.   ACADIA Did Not "Clearly and Unmistakably" Disclaim Pimavanserin Granulations with Excipients

Defendants' main argument is that ACADIA limited its invention during patent prosecution to instances where pimavanserin is granulated alone.  Prosecution history disclaimer has a very high bar that Defendants cannot meet.  Disclaimer only arises when a POSA would have read "the allegedly disclaiming statements [to] constitute a *clear and unmistakable surrender of subject matter*."  *Ecolab Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009).  The doctrine "does not apply where the alleged disavowal is ambiguous."  *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007); *see also Mass. Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016) ("Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer.").  And "[b]ecause of the potential for such ambiguities, [Courts] have recognized that because the prosecution history represents an ongoing negotiation between the PTO and the applicant it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Elbex Video*, 508 F.3d at 1372.

Further to these requirements, "[e]ven if an isolated statement appears to disclaim subject matter, the prosecution history *as a whole* may demonstrate that the patentee committed no clear and unmistakable disclaimer."  *Ecolab*, 569 F.3d at 1342.  An applicant may make statements

during patent prosecution that may not accord with the full breadth of the claim—that does not

make the claim so limited.  *See, e.g.*, *Mass. Inst. of Tech.*, 839 F.3d at 1119–1122 (holding that,

when read in the greater context of the prosecution history as a whole, the applicant's statements

distinguishing the claim term "vascularized organ tissue" from "skin" did not exclude "skin" from

the scope of the claims); *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293–95 (Fed.

Cir. 2000) (explaining that statements in response to Office Action merely described features of a

preferred process, "plasma etching," and did not "with reasonable clarity and deliberateness"

exclude an alternative process, "ion bombardment.").

If all of the claims were to be limited to granulation alone, ACADIA could have clearly

drafted the claims in the manner Defendants propose.  Rather, ACADIA left its independent

claims open-ended with respect to the granulation process, and reserved, for instance, dependent

claim 13 of the '891 patent to claim a method of granulating pimavanserin alone.  *See infra*

Section II.A.3; Pl. Op. Br. at 6–7.

### a. Defendants Mischaracterize Applicant Statements and Selectively Interpret Prosecution History Excerpts

Defendants cherry-pick instances in the prosecution history where the phrase

"pimavanserin alone," "drug alone," or "pimavanserin tartrate itself" are found to patch together

a narrative that "40 mg granulated pimavanserin tartrate" must always be 40 mg of pimavanserin

granulated alone.  *See* Def. Resp. Br. at 24–25.  As discussed further in Section II.A.1.b,

Defendants ignore portions of the prosecution history inconsistent with their position and which

further demonstrate lack of disclaimer.  *See* Klibanov Decl. at ¶¶ 28–29, 38–39, 44, 48–49.

With respect to the portions of the prosecution history that Defendants choose to cite,

Defendants misstate and selectively focus on certain aspects of these disclosures.  For example,

Defendants rely on D.I. 125-8, Ex. H (September 6, 2019, "Miscellaneous Internal Document"),

by incorporating a single slide entitled "Key Inventive Points" into their brief.  Def. Resp. Br.

at 25.  Below is what Defendants show in their brief, with highlighting they added:



**Key Inventive Points**

- Pimavanserin tartrate can surprisingly  be granulated ( without use of large amounts of excipients, i.e. only water) to achieve:
    - a) novel granulated pimavanserin having a high bulk density of 0.4 to 0.6 g/ml of the granulated drug alone;
    - b)  a particle size distribution of 180 to 340 μm of the  granulated drug alone
- Using the novel granulated pimavanserin tartrate, with 0.4 to 0.6 g/ml bulk density and 180 to 340 μm particle size distribution,  the inventive blended pimavanserin compositions have significantly lower weight percentage of excipients as compared to prior art
- Contrast to well-understood formulation art that requires significant amounts of excipients with the active during granulation to achieve a higher density granulation formulation, thus requiring a very large volume of composition to deliver 34 mg  of pimavanserin
- The final formulation also includes excipient (e.g., microcrystalline cellulose having high bulk density as in the novel granulated pimavanserin

Defendants extrapolate from this slide to state that "the key to Acadia's claimed

invention was to granulate the pimavanserin tartrate API alone."  *Id.* at 26.  But this would not

have been the clear takeaway to a POSA.  *See* Klibanov Decl. at ¶ 48.  To the contrary, the

description in the first bullet point of pimavanserin being granulated is followed by the phrase

"without use of *large amounts* of excipients," which implies, consistent with the patent

specification and embodiments, that while the invention allows for pimavanserin to be

granulated with only water, excipients may also be present in the granulation as claimed.  *Id.*[17]

The remainder of the highlighted phrase "i.e. only water" also lacks clarity since "i.e." is

not always interpreted as definitional, (*e.g.*, when discussing an aspect of one particular

embodiment of the claimed invention)*,* and in this situation it could not be definitional without

---

[17] This implication is consistent with the third bullet point on the same slide, which refers to the formulation prior art as requiring "significant amounts of excipients with the active during granulation."  D.I. 125-8, Ex. H at 5.

being in tension with the prior language in the sentence.  *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1370 (Fed. Cir. 2012) (explaining that patentee's statement of "each side of the disc—i.e., each recording plane" described a particular example and "[i]t does not follow that a recording plane is to be equated with a disc side in all instances"); Klibanov Decl. at ¶ 48.  If only water was to be used during granulation, the previous phrase would have been "without any excipients" and not "without use of large amounts of excipients."  Klibanov Decl. at ¶ 48.  This slide is also unclear as to whether references to granulated "drug" alone refer to granulated pimavanserin in the presence of at least some excipients (drug product), pimavanserin itself (drug substance), or both.  *Id.*  At a minimum, Defendants' citation of this slide does not provide the kind of clarity that would overcome express definitions in the specification, allow for exclusion of multiple disclosed embodiments, and eliminate claim differentiation.[18]

Defendants further disregard the entire preceding slide in the same presentation, which is also titled "Key Inventive Points" and describes broader aspects of the claimed invention:

---

[18] Perhaps knowing it will contradict their position on claim differentiation, Defendants flatly ignore "*i.e. only water*" from the same phrase they highlight in their brief when describing how ACADIA characterized its claimed invention during patent prosecution—although Dr. Moreton still relies upon it.  *See* Def. Resp. Br. at 26, 40–41; Moreton Decl. at ¶ 30 ("The patentees and the inventor considered as its invention granulating pimavanserin tartrate *alone* in a wet granulation process, 'i.e. [using] only water.") (emphasis in original).  Defendants' insistence on interpreting certain language in their favor—while ignoring that which is not—reveals the frailty of their disclaimer argument.  Defendants' read also lends support to the view that a POSA would have understood that the applicant was only discussing an embodiment of the invention with respect to wet granulation, as it was with "granulated drug alone."  *See* Klibanov Decl. at ¶ 49.  The same would apply to the comparative chart cited from the same cited slide presentation. Def. Resp. Br. at 26 (citing D.I. 125-8, Ex. H. at 6); *see* Klibanov Decl. at ¶ 48.

---

**Key Inventive Points**

- Discovered a formulation that could provide <u>large amount (34 mg)</u> of pimavanserin in a <u>small volume (e.g., size 3 or 4 capsule).</u>

  - The claimed invention facilitates orally administering the full effective amount (34 mg) in one dose, in a volume (e.g., size 3 or 4 capsule) that actually can be managed by a patient (especially e.g., a patient with a CNS disorder such as Parkinson's disease).

  - The claimed invention also achieves reproducible and quantitatively accurate filling of the small size capsules

---

D.I. 125-8, Ex. H at 4.

A POSA reviewing these bullet points as a whole would have understood that the goal of the invention was to provide a large amount of pimavanserin in a small volume, but would not see a specific limitation requiring pimavanserin to be granulated with only water and without excipients. *See* Klibanov Decl. at ¶ 48. Indeed, as described in ACADIA's Opening Brief, the applicant compared bulk density data of <u>non-granulated</u> prior art pimavanserin with the granulated pimavanserin of the invention and did not restrict the granulation process. *See* Pl. Op. Br. at 11–12; *see also* D.I. 125-5, Ex. E at 6; D.I. 125-8, Ex. H at 6; *supra* Section II.A.1.d.

Moreover, the reference in the slides to "[a]chieving the claimed pimavanserin bulk density and particle size, without other excipients, was unpredictable and unexpected" does not amount to a disclaimer either. D.I. 125-8, Ex. H at 9. The applicant in this bullet point is using shorthand which does not discuss "granulated" pimavanserin, is not tied to any specific claim language, and moreover includes a non-restrictive clause (set off by commas) to describe an embodiment where granulation is performed "without other excipients." *Id.*

Defendants also rely on the July 30, 2019, Applicant Remarks and Claim Amendments to argue that "Acadia's characterization of its 'invention' as granulated pimavanserin tartrate without excipients continued in its written response." Def. Resp. Br. at 26–27 (citing D.I. 125-5, Ex. E). Defendants' reliance is misplaced; the applicant did not include any remarks requiring pimavanserin to be granulated alone.[19] For example, the applicant stated that:

> [T]he instant claimed invention is directed in part to small volume capsules (size 3 or 4) that include 34 mg of pimavanserin, i.e., a small capsule having a high bulk density of 0.4 to 0.6 g/mL pimavanserin (drug alone) that eases swallowing while delivering a full 34 mg of drug.

D.I. 125-5, Ex. E at 5.

The applicant further noted that:

> Nothing in the '330 Application teaches or suggests such high bulk density of e.g. pimavanserin granulate, as e.g., recited in the instant claims. Rather, Example 9 (and Table 8) of the '330 Application, which is representative, includes low-density pimavanserin, and requires ~80% w/w of the excipients mannitol, starch, povidone, and magnesium stearate to achieve a bulk density of 0.56 mg/mL of a *formulation of pimavanserin (and not pimavanserin alone)*. In part because the '330 Application requires such high percentage of excipients to achieve this density, the formulations of '330 Application cannot provide a 34 mg pimavanserin composition that would fit into a size 3 or 4 capsule.

*Id.* at 6 (emphasis in original).

The applicant did not limit granulation of pimavanserin to pimavanserin granulated alone, but rather noted the high quantities of excipients, for example, "~80% w/w of the excipients mannitol, starch, povidone, and magnesium stearate" necessary "to achieve a bulk density of 0.56 mg/mL." *Id.* Achieving such a bulk density was desirable to fit a formulation containing the full 34 mg of pimavanserin free base inside a size 3 or 4 capsule. The applicant's issue with

---

[19] Defendants appear to argue that if the prosecution history disclosed bulk density values of pimavanserin alone, then ACADIA has somehow clearly and unmistakably limited the claims to pimavanserin *granulated* alone. This logic is erroneous and inconsistent with the record. *See* Klibanov Decl. at ¶¶ 55–58.

the prior art was that it did not teach how to encapsulate 34 mg pimavanserin within a size 3 or 4 capsule.  *See, e.g.*, *id.* ("In part because the '330 Application *requires such high percentage of excipients* to achieve this density, *the formulations of [the] '330 Application cannot provide a 34 mg pimavanserin composition that would fit into a size 3 or 4 capsule.*").  The applicant explained that the other prior art reference, U.S. Patent No. 6,451,343 ("Glinecke"), suffered from the same "large ratio of excipients" problem.  *Id.*  ("[Glinecke] requires *a large ratio of excipients to active agent*- for example, Example 2 of [Glinecke] includes <u>only 0.04% w/w of the active agent</u> and *98.5-99.5% w/w excipients* for granulation.").

Defendants argue that the applicant made limiting remarks during prosecution of the '480 patent, citing the conclusion of Dr. Moreton.  *See* Def. Resp. Br. at 27–28 (citing D.I. 125-10, Ex. J; D.I. 125-13, Ex. M; D.I. 125-14, Ex. N; D.I. 125-15, Ex. O; Moreton Decl. at ¶¶ 2–3).  Dr. Klibanov disagrees with Dr. Moreton, and the prosecution history does not impose any limitation on the claims requiring pimavanserin granulated alone.  *See* Klibanov Decl. at ¶¶ 28–30, 34–69. In each of those remarks, the applicant did not distinguish the prior art based on pimavanserin being granulated alone, but rather referred to the significant amounts of excipients that made it impossible to fit 34 mg pimavanserin in a smaller capsule size.  *Id.* at ¶¶ 54–63.

### b. A Collective Assessment of the Record Shows that Defendants' Cited Isolated Statements Do Not Support Alleged Disclaimer

The cited applicant statements were not "clear and repeated" statements of disclaimer, as Defendants argue, but were instances within the negotiation between applicant and examiner, in which the applicant placed emphasis on certain salient characteristics of a preferred embodiment. *See, e.g.*, Klibanov Decl. at ¶¶ 38–44, 48–49, 55–56.  Such arguments do not create disclaimer of otherwise broad claim language.  *See, e.g.*, *Mass. Inst. of Tech.*, 839 F.3d at 1119–1122; *N. Telecom Ltd.*, 215 F.3d at 1293–95.  This is demonstrated by the fact that, beyond the subset of

exhibits relied upon by Defendants, other prosecution history exhibits reveal that the claims were not limited to pimavanserin granulated alone. *See* Klibanov Decl. at ¶¶ 34–69 (performing collective assessment of prosecution history).

A collective assessment of the prosecution history would include at least the following exhibits (all from D.I. 125):

- Ex. F: This interview summary recorded what transpired during the July 23, 2019 interview between the applicant, inventor Dr. Ravi Tejwani, and the examiner a few days before the July 30, 2019 remarks (D.I. 125-5, Ex. E) were filed in the application which became the '185 patent.  The summary's "Brief Description of the main topic(s) of discussion" states in full: "Applicant presented arguments related to the novelty of the instant invention.  Applicant argues that th[e] density, and lower percentage of excipients, distinguishes the instant invention of the prior art.  Examiner agrees [to] consider these arguments upon receipt and agreed that these limitations might distinguish over the prior art."  D.I. 125-6, Ex. F at 2.  Despite Defendants' allegations as to what ACADIA had clearly and unmistakably limited the claims to during the slide presentation from the same interview (discussed *supra* at 46–49 (D.I. 125-8, Ex. H)), a POSA reviewing this Interview Summary would not believe that ACADIA limited the claims to pimavanserin granulated alone.  *See* Klibanov Decl. at ¶ 45.

- Ex. G: This September 6, 2019 Notice of Allowance was issued by the examiner in the patent application which became the '185 patent.  Issued over a month after the July 23, 2019 slide presentation and July 30, 2019 remarks cited by Defendants, the examiner in the "Reasons of Allowance" nowhere stated that the inventions are directed to pimavanserin granulated alone or that pimavanserin granulated alone is a critical aspect

of the inventions distinguishing them from the prior art.  A POSA would have understood that the claims were allowed because "[t]he instant invention allows for more active agent to be delivered in a smaller dose that is easier [for patients] to swallow and increases compliance."  D.I. 125-7, Ex. G at 7; *see* Klibanov Decl. at ¶ 46.

- <u>Ex. I</u>: This October 10, 2019 Non-Final Office Action in the application, which became the '480 patent, rejected the then-pending claims over the same two prior art references. Similar to the prosecution of the '480 patent, the examiner's remarks would not have suggested to a POSA that pimavanserin granulated alone is a claim limitation or that the prior art references teach such a limitation.  *See* Klibanov Decl. at ¶ 50. While this Office Action was issued months after the July 30, 2019 remarks and the July 23, 2019 slide presentation discussed during the Examiner Interview, the examiner provides no suggestion that pimavanserin must be granulated alone.  *Id.*

- <u>Ex. L</u>: This January 30, 2020 Final Office Action in the application, which became the '480 patent, maintained similar reasons for rejecting the then-pending claims as in the October 10, 2019 Non-Final Office Action.  The examiner addresses the arguments raised by the applicant in the December 17, 2019 supplemental response (D.I. 125-11, Ex. K) and does not find them to be persuasive.  D.I. 125-12, Ex. L at 6–7.  Nowhere does the examiner address the claims as requiring, or the prior art as teaching, that pimavanserin is granulated alone.  A POSA would not understand from the examiner's remarks addressing the applicant's arguments that the claims were limited to pimavanserin granulated alone.  *See* Klibanov Decl. at ¶ 53.

- <u>Ex. R</u>: This October 15, 2020 Notice of Allowance was issued by the examiner in the patent application which became the '891 patent.  The examiner states: "the claims are

drawn to a capsule formulation comprising 34 mg of pimavanserin tartrate in a capsule

shell sized 3 or 4 where the bulk density is >0.4 g/ml.  The instantly granulated

pimavanserin allows for minimal excipients in smaller dosages that are easier to swallow.

The closest prior art is drawn to 20070264330 which discloses a pimavanserin

formulation, however the density of the granulation would not allow for the same amount

of the drug to be present in the capsule.  The instant invention allows for more of the

active agent to be present in a smaller capsule that is easier to swallow."  D.I. 125-18, Ex.

R at 7.  A POSA would have understood from the examiner's most recent statement on

the claims that the inventions allowed for more pimavanserin in smaller capsules, not that

the claims were limited to pimavanserin granulated alone.  *See* Klibanov Decl. at ¶ 68.

Thus, Defendants' disclaimer argument is fatally defective by failing to consider other

relevant statements from the prosecution history of the asserted formulation patents.

### c.    Disclaimer Cases Cited by Defendants Highlight Why Their Showing Here Fails

Defendants cite several cases to argue that ACADIA's statements rose to the level of

clear and unmistakable disclaimer.  *See* Def. Resp. Br. at 28.  But these cases are unavailing.

Defendants first cite *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.* for the

proposition that disclaimer may be found, "*for example*, when the patentee explicitly

characterizes an aspect of his invention in a specific manner to overcome the prior art."  438 F.3d

1123, 1136 (Fed. Cir. 2006).  But this was a passing reference to another case with different facts

where disclaimer was found, and not the basis of the Court's decision.  *See id.*  In fact, **the Court

in *Purdue* found that the strict standard for disclaimer had not been met**, reversing the

district court's decision for clear error.  *Id.*  ("We agree with [the plaintiff] that it made no such

disclaimer or disavowal, and the trial court's holding to the contrary was in error.").  The Court

explained that the claims contained none of the purported limitations, and that "*it is the claims ultimately that define the invention.*" *Id.*  Thus, "[w]ithout any specific claim language to interpret[,] the trial court impermissibly imported a limitation into the claims." *Id.* at 1136–37 (explaining that "[e]xtraneous limitations cannot be read into the claims from the prosecution history.").

*Computer Docking Station Corp. v. Dell, Inc.* is also inapposite.  The term "portable computer" had been construed by the district court to exclude devices with "built-in displays and keyboards – that is, laptops."  519 F.3d 1366, 1376 (Fed. Cir. 2008).  In affirming, the Federal Court pointed out that "the *totality* of the prosecution history informs the disavowal inquiry." *Id.* at 1379.  Further, "the specification . . . d[id] not create any ambiguity" as it "d[id] not suggest that the claimed invention encompasses laptops." *Id.* at 1378–79.  Rather, the specification further "emphasize[d] differences between the claimed invention and laptops." *Id.* at 1379. Here, however, the specification does the opposite, it: (1) provides clear definitions that acknowledge pimavanserin granulations may contain excipients, *e.g.*, a binder, and (2) provides clear embodiments of such granulations, all of which track ACADIA's proposed construction. On the other hand, Defendants' proposed construction conflicts with the patent specification and is unsupported by the totality of the prosecution history.  "The prosecution history must always receive consideration in context." *Id.* at 1378.  When read in context, the statements in the prosecution history do not rise to the high level of clear and unmistakable disavowal.

Defendants' reliance on *David Netzer Consulting Engineering LLC v. Shell Oil Co.* is also misplaced.  In *David Netzer*, the parties argued over whether the defendants' "extraction" process was a type of "fractionating" process covered by the plaintiff's asserted patent.  *See David Netzer Consulting Eng'g LLC v. Shell Oil Co.*, 824 F.3d 989, 994 (Fed. Cir. 2016).

Relying almost exclusively on passages from the *specification* that supported a finding of disclaimer with respect to conventional extraction processes more generally, the Court found that "extraction" was not a type of "fractionating." *See id.* at 994–996. Unlike *David Netzer*, here the specification does not contain statements of disclaimer. Instead, the specification supports ACADIA's proposed construction.

> ### d.  Pimavanserin Granulations Including Excipients Are Consistent with the Prosecution History

Defendants argue that ACADIA's only support for the contention that "[t]he claimed 40 mg granulated pimavanserin tartrate may contain, *e.g.*, the active ingredient and excipients in the granulation" is an asterisk "that Acadia omitted from the chart it submitted to the examiner." Def. Resp. Br. at 29.[20] This is simply wrong. Defendants also allege this was an intentional omission; this is an unsupported allegation of fraud with no basis in the record. *See id.* at 31. In any event, Defendants could not support this assertion because the entire Table 1 was presented in the original application as filed, and was there all along for the examiner to openly review. The applicant provided citations to the entire Table 1 from the specification as filed, making clear that the portion included in the Office Action response was merely for convenience. *See*, *e.g.*, D.I. 125-5, Ex. E at 6 ("As the Office will recognize, the comparative chart *in the instant application at [0052]-[0054]), shown below for convenience . . . .*"). Furthermore, as explained by Dr. Klibanov, there is nothing inconsistent or wrong with presenting bulk density data from

---

[20] To the extent Defendants suggest that ACADIA needed to affirmatively state that pimavanserin granulations may contain added excipients in the prosecution history, such an argument should be rejected. Granulations including pimavanserin and excipients are the default per the definitions of "granulation" and "binder" in the specification—which Defendants ignore. Furthermore, ACADIA has in fact presented the asterisk next to "Pimavanserin granulation" in a chart it submitted to the examiner. *See* D.I. 125-11, Ex. K at 4; Klibanov Decl. at ¶ 52.

the pimavanserin granulation (including excipients within the granulation) in the comparative chart of Table 1.  *See* Klibanov Decl. at ¶¶ 40–43.

Defendants allege that "[t]he asterisk footnote simply informs the reader that there is a final blend as disclosed in the example hereinbelow and in table 2."  Def. Resp. Br. at 29 n.13 (citing '480 patent, 10:26).  A POSA would not have read the asterisk this way.  *See* Klibanov Decl. at ¶¶ 42–43.  Nothing in the specification or file history suggests that the data is not from the final blend.  Defendants refuse to acknowledge that the data reflects a final blend, despite the breadth of disclosures in the specification.  *See, e.g.*, '480 patent at 4:55–56, 17:36–51, 22:12–28; Klibanov Decl. at ¶ 43.  Predictably, Defendants dismiss any pertinent disclosures in the specification by reverting back to their conclusions regarding prosecution history disclaimer. *See* Def. Resp. Br. at 30 ("The fact that both the granulated pimavanserin and the final blended composition can have similar bulk densities does not change the clear statements Acadia made during the prosecution histories") (discussing '480 patent at 22:18–28).  The argument posited by Defendants that ACADIA could not have made arguments under its interpretation is baseless. *See id.* at 29–30 n.13.  ACADIA could, and did, make the arguments it presented to the examiner during prosecution of the asserted formulation patents.

Defendants argue that "[t]here can be no doubt from the prosecution histories and the language of the claims themselves that the bulk density of granulated pimavanserin tartrate is separate from the bulk density of the ***blended*** composition.  Blending (mixing) is not granulation."  *Id.* at 31 (emphasis in original).  ACADIA has not sought a construction by which mixing is granulation, or vice versa, or that the bulk density of a granulation must reflect that for a blended composition.  To the extent Defendants are pressing their argument that ACADIA's

construction for "40 mg granulated pimavanserin tartrate" conflicts with "blended pimavanserin composition," it is a straw man position.

Defendants argue that a statement which ACADIA made during prosecution of the '185 patent with reference to then pending claim 4 "ends the inquiry." Def. Resp. Br. at 31. What Defendants fail to mention is that pending claim 4 (which became granted claim 3 of the '185 patent) nowhere recites the word "granulated" or the claim terms at issue here. Indeed, Defendants recognize the different scope of this term and its missing reference to granulation. Def. Resp. Br. at 42–43. A POSA would not simply connect Defendants' cited statement to "40 mg *granulated* pimavanserin tartrate." *See* Klibanov Decl. at ¶ 38.

### 2. Defendants Selectively Interpret the Specification

In addition to their erroneous disclaimer argument, Defendants err by selectively interpreting the specification to support their construction. For instance, Defendants argue that certain "novel elements" described in the specification require the claimed inventions to be limited to pimavanserin granulated alone. *See* Def. Resp. Br. at 35. But Defendants quote the statement out of context to make it appear as though "novel elements" must mean pimavanserin that has been wet granulated, alone, and in the specific manner further described by Defendants. The full statements cited by Defendants are as follows: "In particular, disclosed herein are formulations, granulations, dry milling, blending, and encapsulation of pimavanserin containing novel elements." '480 patent at 10:40–43. The paragraph continues: "Salient features are that *the known granulation technology uses atypical parameters to achieve the desired results*." *Id.* at 10:43–45. Thus, traditional granulation technologies using atypical parameters may be used to achieve the desired results, namely, fitting the full 34 mg pimavanserin in a small-sized capsule. The definition for "granulation" lists various granulation methods not limited to pimavanserin alone. *See id.* at 4:61–63.

Defendants also misstate the specification to infer that "the key to the claimed invention, and the reason Acadia was able to formulate 34 mg of pimavanserin into one dosage form (as opposed to the *two* pills or larger capsules of the prior art) was to granulate the pimavanserin alone." Def. Resp. Br. at 35 (emphasis in original). But when read as a whole, the specification does not support this. *See* Klibanov Decl. at ¶ 109. In particular, the specification describes processes and embodiments that do not require pimavanserin to be granulated alone. *See* Pl. Op. Br. at 10–11.

Defendants further allege that "Acadia argues that Table 2 describes *granules* that contain 40 mg pimavanserin, 59 mg microcrystalline cellulose, and 1 mg magnesium stearate (i.e., according to Acadia, the granules contain the entire composition)." Def. Resp. Br. at 37 (emphasis in original). But ACADIA's point is simply this: Table 2 describes attributes of another embodiment of the claimed inventions: a pimavanserin granulation of approximately 100 mg that includes pimavanserin and excipients. *See* '480 patent at 21:10–22. The specification does not specify whether the granules are of pimavanserin alone; instead, the specification points to the 100 mg "final blend" as the pimavanserin granulation. *See id.* at 10:19–26 (Table 1), 21:10–22 (Table 2), 22:12–16 ("[S]ome embodiments disclosed herein relate to pimavanserin *granulation*, e.g. composed as in table 2, having a weight of *granulation* of 100 mg±7 (average of 20 samples), i.e. the weight relates to the *granulation* only, i.e. excluding capsule shell weight."). A POSA would have understood "pimavanserin granulation" here to describe an embodiment of 100 mg in weight. *See* Klibanov Decl. at ¶ 43. Thus, consistent with other disclosed embodiments, the pimavanserin granulation of Tables 1 and 2 may refer to pimavanserin granulated with excipients. *Id.*

Defendants attempt to link Table 2 with certain methods in the specification that involve wet granulating pimavanserin alone.  *See* Def. Resp. Br. at 37.[21]  But a POSA reading the specification would not have understood any such connection to exist.  *See* Klibanov Decl. at ¶¶ 104–105.  For instance, Defendants point to the process preceding Table 2 as the process by which the pimavanserin granulation of Table 2 was made.  *See* Def. Resp. Br. at 37.  But the specification does not make this connection, and a POSA reading it would not have understood this to be true.  *See* Klibanov Decl. at ¶ 108.  Nothing restricts a POSA from having a broader view consistent with the other disclosed embodiments of pimavanserin granulations.  *Id*.

Defendants suggest that ACADIA argues that the "alleged invention encompasses any and all types of pimavanserin granulations that contain other ingredients."  *See* Def. Resp. Br. at 39.  But this is incorrect, as ACADIA's claimed invention would not encompass those from the prior art, *e.g.*, granulations that could not fit 34 mg pimavanserin in a size 3 or 4 capsule (these specific capsule sizes are other limitations in the asserted claims).  Thus, a POSA would have relied on the clear definition for "granulation" to understand that a pimavanserin granulation may contain at least some excipients within the granulation.  *See* Klibanov Decl. at ¶¶ 55, 92.

ACADIA notes a further inconsistency in Defendants' position regarding the specification, which picks and chooses some definitions to follow and ignores others.  While Defendants disregard the supposedly "generic" definitions of granulation and binder, Defendants

---

[21]  Defendants make the strained argument that their construction does not improperly import a process limitation requiring wet granulation, while at the same time aim to link specification disclosures to wet granulation and premise their disclaimer arguments on statements showcasing wet granulation.  Defendants admit that wet granulation is the only method described in the specification by which pimavanserin can be granulated alone, but to avoid this implication to their construction, retreat to the breadth of granulation processes in the specification's definition of granulation—which they simultaneously argue is irrelevant to claim construction.  Def. Resp. Br. at 39–40.  Defendants maneuvering here is a failed attempt to avoid claim differentiation.

agreed to the joint construction of "a blended pimavanserin composition."  *See* D.I. 125, Ex. 1.

This joint construction follows plainly from the specification's definition of "blending," much

like ACADIA's construction for "40 mg granulated pimavanserin tartrate" tracks the

specification's definition of "granulation."  *See* Klibanov Decl. at ¶ 94.  The term "blending" is

defined as "the mixing of pharmaceutical ingredients to form a mixture of the ingredients, e.g.

active pharmaceutical ingredient (API) and diluent," in accord with the joint construction.[22]  '480

patent at 4:64–66; *see also* Klibanov Decl. at ¶ 94.  Defendants cannot simply brush some

definitions aside while accepting others.

Further, Defendants ignore the numerous embodiments that support ACADIA's proposed

construction.  *See* Pl. Op. Br. at 10–11; Def. Resp. Br. at 38–39.

### 3. Claim Differentiation Supports ACADIA's Proposed Construction

Defendants initially try to deflect ACADIA's claim differentiation argument by reverting

to their erroneous position that prosecution history disclaimer overcomes such arguments.  *See*

Def. Resp. Br. at 41.  When Defendants try to engage with ACADIA's claim differentiation

argument, they err in characterizing the differences between independent claim 8 and dependent

claim 13 of the '891 patent, purporting to identify "several differences" between them.  *Id.*  In

actuality, however, there are only two differences that would have been appreciated by a

POSA—namely that dependent claim 13 further includes (1) "**wet granulating native**

**pimavanserin with water**," and (2) **"without the addition of a binder**."  *See* Klibanov Decl. at

¶¶ 84–88.  These two differences are shown below in claims 8 and 13 of the '891 patent:

---

[22]  Defendants allege that ACADIA agreed to the construction of "a blended pimavanserin
composition" in order "[t]o avoid the discord of arguing both terms in its briefing."  Def. Resp.
Br. at 33.  That is incorrect.  ACADIA was pleased that Defendants agreed to a joint construction
that flowed plainly from the specification's definition of "blending."  Such definitions are
important and Defendants seem to agree that they shed light on this term to a POSA.

8.  A pharmaceutically acceptable capsule for orally delivering 5-34 mg of pimavanserin to a patient, wherein the capsule contains a blended pimavanserin composition comprising:

granulated pimavanserin or a pharmaceutically acceptable salt thereof, wherein the bulk density of the granulated pimavanserin or pharmaceutically acceptable salt thereof is 0.4 g/ml to 0.6 g/ml as determined by USP<616>, method 1; a filler and optionally a lubricant.

13.  The pharmaceutically acceptable capsule of claim **8**, wherein the granulated pimavanserin is formed by **<u>wet granulating native pimavanserin with water</u>**, and **<u>without the addition of a binder</u>**.

In arguing that their construction "satisfies the principle of claim differentiation," Defendants ignore the latter difference, *i.e.*, without the addition of a binder.  *See* Def. Resp. Br. at 42.  Defendants attempt to disguise this error by lumping the two differences together as one. *Id.* at 41.  ("[C]laim 8 would allow any process of making pimavanserin tartrate granules, i.e., pimavanserin tartrate granulated alone, while claim 13 requires the specific wet granulation method highlighted in the specification—wet granulating native pimavanserin with water, and without the addition of a binder.");  *see also* Moreton Decl. at ¶ 69; Klibanov Decl. at ¶¶ 84–85. Yet these are separate and distinct limitations under dependent claim 13, and a POSA would have read "without the addition of a binder" to imply broader scope for independent claim 8, *i.e.*, with the addition of a binder (or other excipient).  *See* Klibanov Decl. at ¶¶ 85, 88.

Defendants further try to create an issue regarding the terms "granulated pimavanserin or a pharmaceutically acceptable salt thereof" in claim 8 and "granulated pimavanserin" in claim 13.[23]  A POSA would have understood the former as the antecedent basis for the latter.  *See*

---

[23] Defendants inaccurately characterize ACADIA's Opening Brief in stating "[a]s Acadia recognizes in a footnote, claim 8 allows salts of pimavanserin, while claim 13 does not."  Def. Resp. Br. at 41 (citing Pl. Op. Br. at 7, n.7).  All that ACADIA explains in this footnote is the teachings from claim 13 support that "granulated pimavanserin" is not limited to a specific granulation process.  ACADIA did not make any concessions about exclusion of salts.

Klibanov Decl. at ¶ 87.  Dr. Moreton also had no issue connecting these elements for purposes of his analysis.  *See id.*; Moreton Decl. at ¶ 70.

"[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*).  The doctrine of claim differentiation is at its strongest "where the limitation that is sought to be read into an independent claim already appears in a dependent claim."  *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012).

The presumption of claim differentiation clearly applies here.  Defendants seek to read into the claims "pimavanserin granulated alone," but the second difference added to claim 13 is "without the addition of a binder."  There is no dispute that "without the addition of a binder" would result in "pimavanserin granulated alone."  *See* Moreton Decl. at ¶ 69 ("Claim 13 of the '891 patent in fact emphasizes that the granulation is 'without addition of a binder,' which tells a POSA that pimavanserin tartrate is to be granulated alone.").  A POSA would have understood this difference as including any process of formation which does not include a binder, *i.e.*, any process used to granulate pimavanserin alone.  *See* Klibanov Decl. at ¶ 85.  Defendants' construction should be rejected based on claim differentiation and this second difference between claims 8 and 13 of the '891 patent alone.

With respect to the first difference—which is distinct and narrower than the second difference—Defendants try to divorce wet granulation from their construction.  Def. Resp. Br. at 40 ("Defendants' construction simply describes what Acadia allegedly invented and claimed— granules of pimavanserin alone").  But this argument is not credible in view of the contrary disclosures relied upon and characterized by Defendants and Dr. Moreton as including wet

granulation as part of the claimed invention.  *See, e.g.*, *supra* at 48 n.18; Moreton Decl. at ¶ 30;

Def. Resp. Br. at 25 (highlighting "*i.e.*, only water"), 35 (stating "[t]he specification summarizes

the purportedly surprising or novel aspects of the alleged invention in a manner consistent with

how Acadia described its invention to the Patent Office—a process for manufacturing a capsule

of pimavanserin wherein the pimavanserin has been granulated **with water**") (quoting passages

from the '480 patent mentioning "**using only small water quantities**," "**successfully wet**

**granulated**," and "**adding a small . . . amount of water**" and then further stating "[t]his

disclosure squares with Acadia's explanation to the examiner.").

Defendants, through these statements, are reading in wet granulation with water, and the

presumption of claim differentiation should further apply to the first difference.

**4.  The Claims Allow "40 mg Granulated Pimavanserin Tartrate" to
Contain Excipients**

A POSA would have read the claims of the asserted formulation patents as not placing a

limitation on "40 mg granulated pimavanserin tartrate" to be pimavanserin granulated alone.  *See*

Klibanov Decl. at ¶¶ 70–89.  The POSA would have further understood that "40 mg granulated

pimavanserin tartrate" is one element of the broader "blended pimavanserin composition," not

limited by any particular granulation process.  *See id.* at ¶¶ 70, 76.  The presence of additional

claim elements (*e.g.*, a filler, a lubricant) would not imply that "40 mg granulated pimavanserin

tartrate" must be pimavanserin granulated alone.  *See id*. at ¶¶ 80, 82.  ACADIA's construction is

thus consistent with the plain language of the claims.  *See id*. at ¶¶ 70, 80, 82; Pl. Op. Br. at 6–7.

Defendants argue that the claims "include two distinct terms—a 'blended pimavanserin

composition' and 'granulated pimavanserin tartrate,'" and that "Acadia attempts to confound the

former with the latter."  Def. Resp. Br. at 31.  ACADIA does no such thing.  The parties' joint

construction for "a blended pimavanserin composition" is broader in scope than ACADIA's

construction for "40 mg granulated pimavanserin tartrate."  These constructions are below:

| ACADIA's Construction for "40 mg Granulated Pimavanserin Tartrate" | Parties' Joint Construction for "A Blended Pimavanserin Composition" |
|---|---|
| "Granulation resulting from an act or process in which particles, including 40 mg pimavanserin tartrate, are made to adhere to form larger, multiparticle entities" | "a mixture of pharmaceutical ingredients including pimavanserin or a pharmaceutically acceptable salt thereof and one or more excipients mixed together" |

ACADIA's construction for "40 mg granulated pimavanserin tartrate" is consistent with a

granulation which meets its definition and imposes no requirement that granulations must be

blended or become equivalent to blended pimavanserin compositions.  *See* Klibanov Decl. at ¶¶

74, 83.  The term "a blended pimavanserin composition" includes "40 mg granulated

pimavanserin tartrate" in addition to further elements (*e.g.*, a filler and a lubricant), wherein these

further elements are not precluded from being part of the "blended pimavanserin composition."

What Defendants seem to suggest is that pimavanserin granulations cannot contain any

excipients *whatsoever*.  *See* Def. Resp. Br. at 31–33.  Yet they overlook the possibility that "40

mg granulated pimavanserin tartrate" may contain excipients (*e.g.*, a binder to help form

granules), and that such granules may be "mixed" in a "blended pimavanserin composition."

*See, e.g.*, Klibanov Decl. at ¶ 83.

For instance, the fact that "a filler" and "a lubricant" are mixed with "40 mg granulated

pimavanserin tartrate" does not imply, much less require, that "40 mg granulated pimavanserin

tartrate" is free from all excipients.  *See, e.g.*, Klibanov Decl. at ¶¶ 70, 76, 82.  Such an

interpretation is also supported by the specification and the case law.  *See, e.g.*, *MAZ Encryption

Techs., LLC v. Lenovo (U.S.) Inc.*, No. 13-303-LPS, 2015 WL 4035049 at *8–9 (D. Del. Jun. 30,

2015) (declining to adopt the defendants' construction, as doing so would have ignored clear

language from the specification against importing the limitation that two elements pointed to two

entirely distinct components); *Merck Sharp & Dohme Corp v. Fresenius Kabi USA, LLC*, No. 14-cv-4989, 2015 U.S. Dist. LEXIS 148064 at *7 (D.N.J. Oct. 30, 2015) (rejecting a construction requiring different elements to refer to separate and distinct components in the context of a pharmaceutical composition, where compositions generally involve the mixing of things together).

Defendants also argue that "Acadia's problem is that . . . the composition described in Table 2 of the specification cannot satisfy both the 'blended pimavanserin composition' and the 'granulated pimavanserin tartrate' elements in the claims—they are distinct elements." Def. Resp. Br. at 33. Defendants argue that ACADIA's interpretation "would render the 'blended pimavanserin composition' term—a term present in every asserted independent claim of these patents—meaningless." *Id.* But ACADIA points to Table 2 as one of many embodiments showing pimavanserin granulations that include excipients—not to argue such embodiments are blended pimavanserin compositions or meet the mixing requirements for blended pimavanserin compositions. *See* Pl. Op. Br. at 10. Defendants' argument is based on the erroneous idea that the disclosed embodiments conflict with the claim language when they do not. The claims encompass various embodiments of granulated pimavanserin with added excipients.

Defendants end their arguments by quibbling with the "40 mg" amount of pimavanserin tartrate in the claims. *See* Def. Resp. Br. at 34. A POSA, however, would have understood that "40 mg" refers the amount of active ingredient pimavanserin tartrate (or pharmaceutically acceptable salt thereof), and that such an amount contains the equivalent of 34 mg of pimavanserin free base. *See* Klibanov Decl. at ¶¶ 70, 76, 80; Pl. Op. Br. at 11–12.

**B.** **"the granulated pimavanserin tartrate" // "the granulated pimavanserin" // "granulated pimavanserin or a pharmaceutically acceptable salt thereof"**
('185 patent, claim 1; '480 patent, claims 1, 5, 12, 14, 15, 20; '891 patent, claims 1, 8)

Defendants do not offer any additional arguments with respect to these claim terms, and do not respond to the specific arguments made by ACADIA with respect to these terms. *See* Def. Resp. Br. at 42; Pl. Op. Br. at 16–18. ACADIA thus understands that Defendants do not dispute those arguments. Accordingly, ACADIA's constructions for these terms should be adopted.

**C.** **"the bulk density of the pimavanserin tartrate"**
('185 patent, claim 3)

ACADIA has represented that claim 3 of the '185 patent is not asserted against any Defendant, and it is therefore not proper for claim construction. *See* Pl. Op. Br. at 18. Defendants' request for a claim construction pending the execution of a stipulation to this effect is a waste of judicial resources and does nothing to cure the otherwise advisory nature of a claim construction for a non-asserted claim.

**III. CONCLUSION**

For the foregoing reasons, ACADIA respectfully requests that the Court adopt its proposed constructions of the disputed claim terms.

## DEFENDANTS' SUR-REPLY POSITION

### I.    INTRODUCTION

The patentees unambiguously surrendered any claim to have invented pimavanserin *granulated* with excipients because (as the patent examiner pointed out) such a granulation had already been published in the prior art.  Instead, the patentees emphasized over and over that their invention was limited to pimavanserin granulated "alone" which is only thereafter mixed or blended with excipients into a final "composition."  Acadia fails to meaningfully rebut Defendants' prosecution history disclaimer arguments.  Instead, Acadia's Reply weaves a fog of confusion, citing out-of-context specification references, conflating claim terms, and misreading patent examiner statements while effectively ignoring their own pre-litigation assertions to the examiner.

A significant difference exists between the evidence relied on by the parties to support their respective positions on prosecution history disclaimer.  The Defendants' prosecution history disclaimer argument focuses on over a dozen unambiguous statements by the *patentees* across six separate office actions (four written responses and two examiner interview slide presentations) to distinguish the term "granulated pimavanserin tartrate" over prior art granulated compositions that contain pimavanserin with excipients.  These statements were made in, among other filings, slides prepared specially by the patentee to persuade the patent examiner during interviews to allow the claims over the prior art compositions.  In comparison, Acadia seeks to get around the prosecution history disclaimer by pointing to statements by the *patent examiner* (and extrinsic evidence interpretations of them).[24]  Put simply, Acadia tries to dismiss the patentees' numerous unambiguous statements to the U.S. Patent and Trademark

---

[24] Acadia's interpretation of the examiner's statements is also incorrect.  Nothing that the examiner said is inconsistent with the patentees' repeated disclaimer.

Office (USPTO), and instead focuses on brief summaries from the patent examiner.  This approach is inappropriate because it is the patentee's own unambiguous statements that work a prosecution history disclaimer.

Acadia also employs a number of tortured arguments to attempt to undercut Defendants' proposed construction.  Acadia variously argues that Defendants' construction:  omits embodiments, makes mistaken arguments about the patent specification, and is barred by claim differentiation.  None of these arguments are correct; nor do any overcome the clear and unambiguous patentee statements distinguishing the claimed granulated pimavanserin tartrate from the prior art pimavanserin that was granulated with excipients.

The balance of Acadia's Reply contains misapprehensions of the Defendants' positions. For example, Defendants do not concede Acadia's positions on the terms: "the granulated pimavanserin tartrate," "the granulated pimavanserin," and "granulated pimavanserin or a pharmaceutically acceptable salt thereof"—and Defendants stated so in their Response.

## II.   DEFENDANTS' PROPOSED CONSTRUCTIONS ARE CONSISTENT WITH THE INTRINSIC EVIDENCE, INCLUDING THE PATENTEES' DISCLAIMER

### A.   "granulated pimavanserin tartrate"
('185 patent, claim 1; '480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1)

#### 1.   Acadia's Prosecution History Disclaimer

Defendants' proposed construction for this term is "pimavanserin tartrate granulated alone."  It is based on unambiguous statements made by the patentees to the patent examiner during prosecution of the issued patents.  In its Reply, Acadia seeks to rebut the prosecution history disclaimer in essentially three ways.  First, Acadia quibbles with some of the statements made by the patentee, arguing that they do not mean what they literally say.  Acadia Reply at 46-51.  Second, Acadia highlights statements made by the patent examiner (not the patentee) and supplies extrinsic evidence interpretations of the patent examiner's rejections.  *Id*. at 51-54.  Not

only are Acadia's reinterpretations of the examiner's statements incorrect, this sort of "evidence" and argument cannot overcome the unequivocal statements by the patentees themselves that were made to distinguish the pending claims—that contain the disputed claim term—over the prior art. Third, Acadia makes a largely academic claim differentiation argument which is incorrect and inapplicable here.  *Id.* at 61-64.

> ### a.   The patentees distinguished the prior art because it was granulated with excipients, unlike the patentees' claimed invention.

During prosecution of the applications that issued as the '185 and '480 Patents, the patentees characterized the claimed granulated pimavanserin tartrate claim element as either "granulated pimavanserin alone" or "granulated drug alone," over a dozen times.[25]  *See* Def. Resp. at 24-28.  The patentees made these representations in no less than six separate submissions to the USPTO.  Two of those six submissions were slide shows that the patentees prepared for examiner interviews, where the patentees repeatedly characterized the allegedly inventive granulated pimavanserin tartrate as being granulated "alone."  *Id.*  These statements are all consistent, relate to the same claim element, and were made to overcome obviousness rejections based on multiple prior art references.  These repeated, unambiguous patentee statements are the epitome of prosecution history disclaimer.

The reason the patentees made these unambiguous statements was to distinguish the prior art over which the examiner had rejected the pending claims.  The examiner rejected the claims because the prior art "discloses an oral formulation comprising pimavanserin tartrate," where

---

[25] The representations and disclaimer Acadia made during the prosecution of the '185 and '480 patents carry forward to the '891 patent, absent a clear rescission. *See Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1318 (Fed. Cir. 2007).  Acadia cannot provide any rescission in the '891 prosecution history.

"the formulation is ***granulated***," and where the bulk density falls within the scope of the patentees' claims.  *See* D.I. 125, Ex. D at 5 (emphasis added)[26]; Def. Resp. at 25.  To overcome that rejection, the patentees explained that, unlike the prior art where the entire formulation (i.e., API plus excipients) was granulated, the patentee's claimed invention only involved granulating the "drug alone" (i.e., granulating only the API—pimavanserin tartrate), and ***not*** the excipients.  Def. Resp. at 25. That was allegedly the key to how the patentees were able to fit the entire formulation into a smaller capsule size than in the prior art.  Ex. H at 4, 6.

> **b.   Acadia quibbles with the meaning of the patentees' statements to the examiner, but does not deny them.**

Acadia does not dispute the fact that the patentees made express statements to the patent examiner about the meaning of the claimed invention—statements in which the patentees identified their "Key Inventive Points" to the examiner.  Ex. H at 5.  Acadia is left instead to nitpick the context of the patentees' statements and to offer unstated and unsupported alternate meanings.  But none of Acadia's arguments can undo what the patentees told the examiner to secure allowance of the patents.  Any other interpretation would have run into the prior art that the patentees were trying to distinguish.

For example, Acadia's Reply alleges that the Defendants are "extrapolat[ing]" a conclusion from the patentees' slide presentation to the examiner.  Acadia Reply at 46-47.  But Defendants are simply taking the patentees at their word.  The patentees' slide states:

- Pimavanserin tartrate can surprisingly  be granulated ( without use of large amounts of excipients, i.e. only water)  to achieve:
  a) novel granulated pimavanserin having a high bulk density of 0.4 to 0.6 g/ml of the granulated drug <u>alone</u>;
  b)  a particle size distribution of 180 to 340 μm of the  granulated drug <u>alone</u>

---

[26] Unless noted otherwise, all exhibit citations herein refer to the exhibits attached to D.I. 125.

Ex. H at 5 (emphasis original).  Defendants are not extrapolating—the patentees said that the claimed "novel granulated pimavanserin" is "granulated drug <u>alone</u>."  *Id.*  Rather, it is Acadia who sows confusion where there is none.  Acadia argues that the language "without use of large amounts of excipients, i.e., only water" is somehow unclear because it may be discussing one aspect of one particular embodiment.  Acadia Reply at 47.  But the title of the slide refers to the "Key Inventive Points" of the entire claimed invention, not just one embodiment.  And the patentees' explanation that pimavanserin can "surprisingly be granulated (without use of large amounts of excipients, *i.e., only water*)" is reinforced by the patentees' statement—*twice*—on the same slide that the granulation refers to "the granulated drug <u>alone</u>."  Ex. H at 5 (emphasis in original).  The patentees did not argue that their granulation had some, undefined ***small*** amount of excipients.  They told the examiner their granulation had ***none***, in contrast to the prior art which requires large amounts.  There is nothing ambiguous or contradictory about the patentees' disclaimer.[27]

Acadia also argues that Defendants supposedly "disregard" other statements made by the patentees, such as a prior slide that "describes broader aspects of the claimed invention."  Acadia Reply 48-49.  But none of the patentees' other statements contradict the disclaimer or Defendants' construction.  In the prior slide to which Acadia refers, the patentees explain that they are able to fit their overall formulation (including excipients) into a smaller volume.  Ex. H at 4.  The next slide explains how they do that:  by granulating the API alone to achieve a high

---

[27] Acadia accuses Defendants of ignoring the phrase used by the patentees "i.e., only water" when it does not suit them.  But Defendants do not ignore that phrase at all.  The patentees used that phrase to explain that water may be used in the granulation of the pimavanserin API.  The patent explains that the water is later evaporated off as the pimavanserin granules are dried.  *See* Def. Resp. at 36-37; '480 patent at 20:20-45; *see also* Moreton Nov. 10, 2021 Decl. ¶¶74, 89-90 (explaining that any water involved in granulating pimavanserin is removed by drying).

bulk density.  That high bulk density of the API alone means that the patentees' ultimate formulation needs "significantly lower weight percentage of excipients as compared to prior art"—meaning that their formulation (with excipients) can fit into a smaller capsule.  Ex. H at 5 (emphasis original).  The fact that there are other statements not specific to the granulated pimavanserin tartrate component on the slides does not lend ambiguity to objectively clear statements from the patentees about granulated pimavanserin.  *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("Rather, as we have made clear, an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.") (citation omitted).

The patentees concluded their presentation by writing that "[a]chieving the claimed pimavanserin bulk density and particle size, ***without other excipients***, was unpredictable and unexpected."  Ex. H at 9 (emphasis added).  Acadia attempts to brush this statement aside by claiming that the patentees were using an unknown "shorthand" that Acadia neither defines nor explains.  Acadia Reply at 47.  Regardless of whether this is "shorthand," its meaning is clear: no excipients are used to achieve the desired bulk density of the pimavanserin.  Acadia also claims that the statement is untethered to any claim language.  But the statement itself refers to "the ***claimed*** pimavanserin bulk density and particle size."  Ex. H at 9 (emphasis added).  And the patent claims recite a particular bulk density and particle size of "granulated pimavanserin."  *See* '185 patent at claim 1 (emphasis added).  There can be no question that the patentees' disclaimer is tied to the claim language:  the referenced bulk density is of the "granulated pimavanserin," which in turn is pimavanserin "without other excipients."

**c.    The patentees' statements made in their responses to office actions also effected a repeated, clear, and unambiguous disclaimer.**

In their responses to the examiner's rejection, the patentees continued to explain that their claimed invention was directed to pimavanserin granulated "alone." They explained that granulating the API alone gave it a high bulk density (between 0.4 to 0.6 g/ml), which was different from the prior art which used "***low***-density pimavanserin." Ex. E at 6 (emphasis added). In fact, as the patentees explained, the prior art was only able to achieve the desired high bulk density by granulating the entire formulation (excipients and all):

> Nothing in the [prior art] '330 Application teaches or suggests such high bulk density of e.g. pimavanserin granulate, as e.g., recited in the instant claims [that bulk density being 0.4 to 0.6 g/ml]. Rather, Example 9 (and Table 8) of the [prior art] '330 Application, which is representative, includes <u>low-density pimavanserin</u>, and requires ~80% w/w of [certain listed] excipients … to achieve a bulk density of 0.56 mg/mL of a *formulation of pimavanserin (and not pimavanserin alone)*. In part because the [prior art] '330 Application requires such high percentage of excipients to achieve this density, the formulations of [the prior art] '330 Application cannot provide a 34 mg pimavanserin composition that would fit into a size 3 or 4 capsule.

Ex. E at 6 (emphasis original; underlining added). Acadia's explanation of this statement in its Reply is that the patentees were pointing to the "high quantities of excipients" used in prior-art formulations and not limiting their invention to pimavanserin granulated alone. Acadia Reply at 50. But the patentees were clear that they were able to achieve a lower amount of excipients because they granulated the "drug alone," (Ex. E at 5) as opposed to the prior art which achieved the required density (0.56 g/ml) by granulating the "*formulation of pimavanserin (and not pimavanserin alone)*." *Id.* at 6 (emphasis original). The key was that the patentees' granulation of the "pimavanserin (drug alone)" allowed for a lower percentage of excipients to be used in the final formulation. That is why, as the patentees explained, the "instant claimed invention is

directed in part to small volume capsules (size 3 or 4) that include 34 mg of pimavanserin, i.e., a small capsule having a high bulk density of 0.4 to 0.6 g/mL pimavanserin (drug alone)."  *Id.* at 5.

Acadia's response to these statements by the patentees does not rebut the disclaimer.  For all of Acadia's nuance, the simplest explanation is that the patentees were making a coherent argument to the examiner:  1) the prior art discloses a granulated pimavanserin composition— one in which the excipients are granulated ***with*** the pimavanserin API; 2) the patentees, on the other hand, claimed a composition in which the pimavanserin is granulated ***alone*** (without excipients); 3) this leads to a bulk density of the pimavanserin API alone that requires a smaller amount of excipients in the final blended composition; and 4) this in turn means that the patentees' composition can fit into a smaller (size 3 or size 4) capsule. That message works a disclaimer.  The patents-in-suit do not and cannot claim that "granulated pimavanserin" is granulated ***with*** excipients.

Acadia also tries to recast the patentees' citation to the prior art '343 Patent/Glinecke reference, which was cited by the examiner in combination with the prior art '330 Application against the pending claims.  Ex. E at 5-6.  In their Office Action Response, the patentees dedicated just three lines to the Glinecke reference, stating that it failed to cure the deficiencies of the '330 Application because it, too, "requires a large ratio of excipients to active agent" as shown in Example 2.  Acadia's Reply at 50-51; Ex. E.  The patentees' characterization of the Glinecke reference does not render ambiguous their separate statements distinguishing the '330 Application because it disclosed "a *formulation of pimavanserin* (*and not pimavanserin alone)*." Acadia's Reply at 50; Ex. E at 6 (emphasis original).  The simple fact is that the patentees narrowed the claim element "granulated pimavanserin tartrate" to mean pimavanserin granulated alone to avoid prior art that included pimavanserin granulated with excipients.

**d.      Only the patentee can disclaim claim scope—not the examiner.**

Acadia asserts that the Defendants cherry-picked sections of the prosecution histories to support their disclaimer argument when it argues a collective assessment of the record somehow reaches a different conclusion.  It does not.  Defendants cite six separate submissions to the patent examiner containing at least a dozen consistent statements across four office action responses and two separate examiner interview slide show presentations.  The disclaimer here was not effectuated by an isolated patentee statement or a one-off quote, as Acadia suggests.

In any event, Acadia's "collective assessment" of the file history points to statements by the patent examiner—not the patentee—as evidence of purported ambiguity.  Acadia Reply at 51-54.  For example, Acadia cites to the patent examiner notices of allowance, ostensibly, to prove a negative.  *Id.* at 52-53.  Acadia argues that because the examiner's reasons for allowance did not include a recitation of "granulated pimavanserin tartrate alone," then the examiner did not understand the patentees to have made such an argument and so there cannot properly be any prosecution history disclaimer.  *Id.*  Apart from being a logical fallacy (the examiner's statements are in fact ***consistent*** with the patentees' disclaimer), Acadia cites no case authority in support of its rationale.

Rather, the law is clear that statements by the patent examiner have no relevance to the issue of clear and unambiguous disclaimer of claim scope ***by the patentee***.  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374, 1377 (Fed. Cir. 2008) (holding that "the examiner's citation of the single connection limitation in the reasons for allowability does not erase the applicants' clear disavowal of laptops").  It is the patentee that can disavow or narrow claim scope by using clear, unambiguous language.  *Id.*  The examiner cannot affect, or undo, prosecution history disclaimer, by ***not*** relying on the patentees' statements.  *See Laitram Corp.*

*v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998) ("The fact that an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that the statement is inconsequential for purposes of claim construction").  Based on controlling law, Acadia's attempts to rebut the prosecution history disclaimer by referring to statements by the examiner must fail.

In any event, the examiner statements to which Acadia points are simply extensions of the patentees' disclaimer; they are not inconsistent with it:

- Ex. F:  This examiner interview summary notes that the "Applicant argues that th[e] density, and lower percentage of excipients, distinguishes the instant invention [from] the prior art."  Ex. F at 2.  That indeed was the point of the patentees' disclaimer.  By granulating the pimavanserin alone, the patentees claimed to be able to use a lower percentage of excipients in the final formulation. *See, e.g.*, Ex. E at 6; Ex. H at 5 (second bullet).  Nothing the examiner said here contradicts the patentees' disclaimer.

- Exs. G, R:  In these reasons for allowance, the examiner notes that "[t]he instant invention allows for more active agent to be delivered in a smaller dose that is easier to swallow…" (Ex. G at 7), and that "the instantly granulated pimavanserin allows for minimal excipients in smaller dosages that are easier to swallow."  Ex. R at 7.  Again, that is precisely the point that the patentees made when explaining that their invention was to granulate the "drug alone."  Doing so allowed for a smaller amount of excipients to be mixed with that granulated drug, thereby allowing for a smaller capsule. *See, e.g.*, Ex. E at 6; Ex. H at 5 (second bullet). The examiner's statements are entirely consistent with the patentees' disclaimer.

- <u>Exs. I, L</u>: Acadia points to these examiner statements as being altogether silent on the question of granulation.  Thus, far from contradicting the patentees' disclaimer, these statements are simply irrelevant.

Finally, as Dr. Moreton points out, a POSA reading the examiner's reasons for allowance of the '185 patent (Ex. G) would understand that the examiner was indeed referring to 40 mg of the pimavanserin tartrate API that has been granulated alone.  This is because, as the examiner points out, the claims themselves recite that 40 mg of pimavanserin tartrate (separate and apart from the excipients "59 mg of MCC … and 1 mg of magnesium stearate") is measured to give "a specific particle size distribution ["PSD"], bulk density" of the pimavanserin salt alone. Moreton Jan. 2022 Decl. at ¶ 22.  As Dr. Moreton points out, and Dr. Klibanov does not dispute as a matter of science, if a ***mixture*** of pimavanserin and excipients were granulated together, none of the methods recited in the claims can be used to determine the bulk density and PSD of the API (pimavanserin) as a component in that mixture.  *Id.* at ¶¶ 11-12.  Yet the claims at issue require a particular bulk density of the API, consistent with Defendants' construction and consistent with the examiner's statements.

## 2.    Defendants' Construction is Consistent with the Claim Language

Acadia also sidesteps the literal claim language in the asserted claims that contain the terms at issue here.  The context of the claims shows that granulated pimavanserin and excipients are different components, and that the granulated pimavanserin is ***not*** the same as the blended pimavanserin composition.  Def. Resp. at 31-32.

Likewise, Plaintiff's expert declarant, Dr. Klibanov, ignores the words of the actual claim language.  As Dr. Moreton explains, the claims' requirement of numerical values for the bulk density, particle size distribution (PSD), or Carr's Index for "granulated pimavanserin" or

"granulated pimavanserin tartrate" indicates to a POSA that the pimavanserin or its salt ***must have first been granulated alone***, then measured using the specified methods recited in the claims.  Moreton Jan. 2022 Decl. at ¶¶ 10-12.  Dr. Klibanov suggests that, if the API had been granulated along with excipients, "a POSA would have been aware of analytical methods to determine the attributes of components" of multi-component granules.  Klibanov Decl. at ¶¶ 58, 71.  But Dr. Klibanov never clarifies what he means by "attributes of components," and instead refers to "image analysis of sieve fractions" and "microscopic techniques" that appear nowhere in the patents, let alone the claim language itself.  Moreton Jan. 2022 Decl. at ¶¶ 12-17.  As Dr. Moreton points out, Dr. Klibanov never disputes the key point that the *bulk density, PSD, and Carr's Index* claim elements for "granulated pimavanserin" or its salt must be obtained by measuring the API alone, especially when the asserted claims require the measurement to be carried out by specific USP and conventional methods (not the techniques mentioned by Dr. Klibanov).  *Id.*; *see also* '185 patent, claim 1 (requiring USP<616>, method 1, and laser scattering); '480 patent, claim 1 (same), claim 20 (requiring USP<1174> method); '891 patent, claim 1 (also requiring USP<616>, method 1).

Acadia's claim differentiation argument fares no better.  Defendants' construction, which is consistent with the patentees' disclaimer of claim scope, satisfies the principle of claim differentiation.  Def. Resp. at 41.  Specifically, Acadia argues that because claim 13 of the '891 patent specifies a granulation "without addition of a binder," the independent claim must therefore include a binder.  But that is not the case where there are numerous other differences between the claims (i.e., independent claim 8 allows salts of pimavanserin, while claim 13 does not).  *Id.*  Acadia cites *InterDigital Communs., LLC v. ITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012), to support its argument.  Acadia Reply at 63.  In that case, the Federal Circuit found that

the plain meaning of the term "code" had not been overcome by the patentee's lexicography, or disavowal of claim scope, in either the specification or during prosecution.  *Id.*  Those circumstances, however, were much different.  First, the issue of prosecution history disclaimer was not raised; instead, it was the issue of specification disclaimer that was before the court.  *Id*. at 1326-27 (rejecting administrative law judge's construction based on common specification that would have omitted preferred embodiments).  Second, independent claim 1 used the general term "code," while dependent claim 5 claimed the code was a "spreading code," with the clear implication being that the term was narrower in claim 5, and not limited in claim 1.  *Id*.  The *InterDigital* court pointed out that the term "code" was a general term, used with different modifiers in the patent specifications, including "pilot code," "access code," and "spreading code."  *Id*. at 1325, n. 1.  Here, by contrast, the claim term at issue, "granulated pimavanserin tartrate," is not a general term like "code," so the factual underpinnings of that analysis are inapt here.  Furthermore, Defendants are not seeking to limit the meaning of a term in an independent claim (claim 8) to that in a claim depending from it (claim 13).  *Id*. at 1325-26.  Defendants' construction is that there are no excipients in the "granulated pimavanserin"; not that there is simply no binder.

In any event, the *InterDigital* court recognized that strong evidence of prosecution history disclaimer may rebut the presumption of claim differentiation.  *Id*. at 1324 (observing that claim differentiation "can be overcome by strong contrary evidence such as definitional language in the patent or a clear disavowal of claim scope"); *see also Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013) ("Our cases make clear, however, that where found, prosecution history disclaimer can overcome the presumption of claim differentiation.").  Even if

there were potential claim differentiation (there is not), it cannot override the clear disclaimer made by the patentees here.

Finally, Acadia has no answer whatsoever to its admission that the asserted claims call for "40 mg granulated pimavanserin tartrate," in which the 40 mg refers to the amount of pimavanserin API *alone*.[28]  In fact, Acadia restates this admission in its Reply.  Acadia Reply at 66 ("'40 mg' refers [to] the amount of active ingredient pimavanserin tartrate").  The 40 mg does not include any excipients.  Thus, the claim term "granulated pimavanserin tartrate" (which the "40 mg" qualifies) means the amount of the pimavanserin API alone, and not any amount of excipient.

### 3.    The Specification Describes Granulating Pimavanserin Alone

Acadia argues that Defendants have selectively interpreted the patent specification and, in so doing, purportedly ignore possible embodiments which according to Acadia, doom Defendants' proposed construction.  Acadia Reply at 58-61 ("Defendants ignore the numerous embodiments that support ACADIA's proposed construction.").  But, Defendants have not "selectively" interpreted the specification—they merely pointed out the *many* portions of the specification that support their proposed construction.  Def. Resp. 35-40.  Acadia's argument is that Defendants' proposed construction may omit some embodiments described in the specification.  Acadia Reply at 60.  Even if true, that would not render their proposed construction improper because of the patentees' prosecution history disclaimer.  *See Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327 (Fed. Cir. 2002) ("[w]here the prosecution history requires a claim construction that excludes some but not all of the preferred embodiments, such a

---

[28] This is because the weight of the entire composition is much ***more*** than 40 mg, as various claims themselves make clear. *See, e.g.*, '185 patent at claim 1 (40 mg granulated API, plus 59 mg microcrystalline cellulose, plus 1 mg magnesium stearate = 100 mg formulation).

construction is permissible and meets the standard of 'highly persuasive evidentiary support.'")
(citations omitted).  This is even more applicable here, because Acadia has not argued that
Defendants' arguments omit preferred embodiments (and Defendants' construction does not),
but only some plausible embodiments proposed by Acadia.

Acadia also tries to downplay the relevance of the differences between Table 1 and Table
2 in the patent specification.  *See* Defs. Resp. at 29 n.13 (noting the asterisk footnote "informs
the reader that there is a final blend" disclosed in Table 2, as opposed to Table 1, which
compares only the API in the prior art to the API in the claimed invention).  As an initial matter,
Acadia brushes past its omission of the Table 1 asterisk during prosecution—an asterisk that
Acadia interprets as supporting its construction.  Acadia Reply at 56-57.  Acadia correctly states
that the asterisk was included in the original application as filed, while also implicitly admitting
that the asterisk was omitted in arguments made during prosecution.  *Id*.  Regardless, even if
Acadia's reinterpretation of those Tables is correct (it is not as explained in Defendants'
Responsive brief at 10-12), it cannot overcome the patentees' clear disclaimer.

### 4.    Defendants' Construction Does Not Limit the Method of Granulating

Acadia misinterprets Defendants' construction when arguing that it would limit the
method of granulating.  *See e.g.*, Acadia Reply at 46, 60.  Acadia compounds that error when it
asserts that Defendants' construction would mean that only in wet granulation could
pimavanserin tartrate be granulated alone.  *Id.* at 60 n.21.  Defendants have made no such
argument and, in fact, expressly state the opposite:

> Defendants' construction simply describes what Acadia allegedly
> invented and claimed—granules of pimavanserin alone. Whether
> these granules are made by a wet granulation process (described in
> the specification) with a minimum of water that is then dried away,
> or by some other method, is of no matter to Defendants' proposed
> construction.

Def. Resp. at 40.  Defendants have not proposed limiting the claim to only pimavanserin granules made by wet granulation.

Moreover, Acadia's accusation that Defendants disregard the definition of "granulation" in the patent is misplaced.  Acadia Reply at 60.  There is no dispute over the definition of "granulation."  It is indeed a "process in which primary powder particles are made to adhere to form larger, multiparticle entities called granules."  '480 patent at 4:47-50.  However, that definition is agnostic as to the dispute here: whether the patents' reference to "granulated pimavanserin tartrate" refers to API granulated alone.  The patentees answered that question loud and clear in their communications with the USPTO.  The key to the claimed invention was to granulate pimavanserin "alone."  Acadia cannot reinterpret the claims now in litigation.

**B.      "the granulated pimavanserin tartrate"**
   ('480 patent, claims 1, 5, 12, 14, 15; '891 patent, claim 1)
   "the granulated pimavanserin"
   ('185 patent, claim 1; '480 patent, claim 20)
   "granulated pimavanserin or a pharmaceutically acceptable salt thereof"
   ('891 patent, claim 8)

Acadia's Reply mistakenly assumes that Defendants do not dispute its constructions of these claim terms.  Acadia Reply at 67.  Defendants' Response incorporates the arguments with respect to the term "granulated pimavanserin tartrate" to these terms and, in fact, specifically asks that the Court adopt the Defendants' constructions.  Def. Resp. at 66.  For the avoidance of doubt, the Defendants have not changed their position.  These claim terms should be construed the same way as "granulated pimavanserin tartrate" and for the same reasons as given above.  The pimavanserin (or its pharmaceutically acceptable tartrate salt) is granulated alone.

**C.**    **"the bulk density of the pimavanserin tartrate"**
        ('185 patent, claim 3)

The parties have now removed claim 3 of the '185 patent from the case.  Accordingly, this term need not be construed.

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt their proposed constructions of the disputed claim terms.

SAUL EWING ARNSTEIN & LEHR LLP

*/s/ James D. Taylor, Jr.*
James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Charles E. Davis (#6402)
Aubrey J. Morin (#6568)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
(302) 421-6800
James.Taylor@saul.com
Jessica.Jones@saul.com
Chad.Davis@saul.com
Aubrey.Morin@saul.com

OF COUNSEL:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Rebecca A. Hilgar
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
chadpeterman@paulhastings.com
brucewexler@paulhastings.com
scottpeachman@paulhastings.com
rebeccahilgar@paulhastings.com

*Attorneys for Plaintiff*
*ACADIA Pharmaceuticals Inc.*

KRATZ & BARRY LLP

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Attorneys for Defendants,*
*Aurobindo Pharma Ltd. and*
*Aurobindo Pharma USA, Inc.*

SEITZ, VAN OGTROP
& GREEN, P.A.

*/s/ James S. Green, Jr.*
James S. Green , Jr.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-0600
jsgreen@svglaw.com

*Attorneys for Defendants,*
*MSN Laboratories Private Limited*
*and MSN Pharmaceuticals, Inc.*

SHAW KELLER LLP

*/s/ Karen E. Keller*
Karen Elizabeth Keller
John W. Shaw
Nathan Roger Hoeschen
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jshaw@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant,*
*Teva Pharmaceuticals USA, Inc.*

PHILLIPS, MCLAUGHLIN
& HALL, P.A.

*/s/ David A. Bilson*
John C. Phillips , Jr.
David A. Bilson
1200 N. Broom St
Wilmington, DE 19806
(302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.Com

*Attorneys for Defendants,*
*Zydus Pharmaceuticals (USA) Inc.*
*and Cadila Healthcare Limited*

January 28, 2022