**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ACADIA PHARMACEUTICALS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 20-985-GBW |
| | ) |
| AUROBINDO PHARMA LIMITED *et al.*, | ) CONSOLIDATED |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**ACADIA'S ANSWERING BRIEF IN OPPOSITION TO MSN'S
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
OF U.S. PATENT NO. 7,601,740 FOR DOUBLE PATENTING**

## TABLE OF CONTENTS

Page

I.      NATURE OF THE PROCEEDINGS ............................................................ 1

II.     SUMMARY OF ARGUMENT ................................................................... 1

III.    SUMMARY OF UNDISPUTED FACTS ................................................... 2

        A.     Relevant Patent Filing, PTA, and Expiration Dates .............................. 2

        B.     The '561 Application: Relevant Restriction Requirements and Responses ......... 3

        C.     The '527 Application:  Relevant Restriction Requirements and Responses ........ 4

IV.     ARGUMENT ............................................................................. 4

        A.     The '740 Patent Is Immune from MSN's Arguments Under
               35 U.S.C. § 121 ................................................................. 4

               1.     MSN Erroneously Interprets the Requirements for Safe Harbor ............. 5

               2.     The Correct Requirements for Safe Harbor .............................. 6

               3.     Safe Harbor Applies in this Case ..................................... 8

               4.     The Facts Here Also Meet MSN's Incorrect "Requirements" ............... 9

                      a)     MSN's First Requirement Is Met: The '527 Application
                             Was Filed "as a Result of" the '561 Application Restriction ........ 9

                      b)     MSN's Second Requirement Is Met: The '527 Application
                             Was Filed Before the '740 Patent Issued .................................. 11

        B.     Even If MSN Could Argue OTDP Applies, Despite 35 U.S.C. § 121,
               the Argument Still Fails as a Matter of Law ................................. 13

               1.     Precedent Demonstrates that OTDP Cannot Be Based on PTA ............. 14

               2.     Cases Cited by MSN Are Inapposite ................................... 16

               3.     Contrary to its Assertions, MSN's Use of OTDP Against the
                      '740 Patent is Not Grounded in any Relevant Statute and Is
                      Without Merit ........................................................ 17

                      a)     The PTA Statute Is Unambiguous and Enumerates
                             the Only Reasons a PTA May Be Denied or Shortened ............. 17

                      b)     Congress Did Not Implicitly Approve Applying
                             OTDP to PTAs ................................................. 19

V.      CONCLUSION ........................................................................ 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
    746 F.3d 1366 (Fed. Cir. 2014).......................................................................... 17, 19

*Amgen, Inc. v. Sandoz Inc.*,
    No. 18-11026 (MAS) (DEA), 2021 WL 5366800 (D.N.J. Sept. 20, 2021).......... 15, 16, 19, 20

*Aristocrat Techs. Austl. PTY Ltd.. v. Int'l Game Tech.*,
    543 F.3d 657 (Fed. Cir. 2008)................................................................................ 12

*Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*,
    592 F.3d 1340 (Fed. Cir. 2010)....................................................................*passim*

*Eli Lilly & Co. v. Barr Lab'ys, Inc.*,
    251 F.3d 955 (Fed. Cir. 2001)............................................................................. 13

*Ex Parte Cellect, LLC*,
    No. 2021-5046, 2021 WL 5755316 (PTAB Dec. 1, 2021).................................... 16

*G.D. Searle LLC v. Lupin Pharms., Inc.*,
    790 F.3d 1349 (Fed. Cir. 2015)........................................................................... 11

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
    753 F.3d 1208 (Fed. Cir. 2014)....................................................................*passim*

*In re Hubbell*,
    709 F.3d 1140 (Fed. Cir. 2013)........................................................................... 13

*Immunex Corp. v. Sandoz Inc.*,
    395 F. Supp. 3d 366 (D.N.J. 2019), *aff'd*, 964 F.3d 1049 (Fed. Cir. 2020).......... 11

*In re Janssen Biotech, Inc.*,
    880 F.3d 1315 (Fed. Cir. 2018)........................................................................... 11

*Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*,
    Nos. 12-0654; 13-0324, 2015 WL 11430786 (W.D. Mich. Dec. 10, 2015).......... 17

*Merck & Co. v. Hi-Tech Pharmacal Co.*,
    482 F.3d 1317 (Fed. Cir. 2007)....................................................................... 3, 18

*Mitsubishi Tanabe Pharma Corp. v. Sandoz, Inc.*,
    533 F. Supp. 3d 170 (D.N.J. 2021)............................................................ 15, 19, 20

*Novartis AG v. Ezra Ventures LLC*,
    909 F.3d 1367 (Fed. Cir. 2018)....................................................................*passim*

## TABLE OF AUTHORITIES

Page(s)

*Novartis Pharms. Corp. v. Breckenridge Pharms. Inc.*,
    909 F.3d 1355 (Fed. Cir. 2018)......................................................................................... 15

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    518 F.3d 1353 (Fed. Cir. 2008)........................................................................................... 5

*Reflectone, Inc. v. Dalton*,
    60 F.3d 1572 (Fed. Cir. 1995)........................................................................................... 18

*St. Jude Med., Inc. v. Access Closure, Inc.*,
    729 F.3d 1369 (Fed. Cir. 2013)........................................................................................... 4

*U.S. v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001)......................................................................................................... 19

*Union Carbide Corp. v. Dow Chem. Co.*,
    619 F. Supp. 1036 (D. Del. 1985)................................................................................ 10, 11

**Statutes**

35 U.S.C. § 111................................................................................................................ 12

35 U.S.C. § 121............................................................................................................ *passim*

35 U.S.C. § 154............................................................................................................ *passim*

35 U.S.C. § 156................................................................................................... 3, 14, 16, 18

CREATE Act...................................................................................................................... 20

Patent Act.......................................................................................................................... 19

Uruguay Round Agreements Act.................................................................................. *passim*

MSN's Motion for Summary Judgment of Invalidity of U.S. Patent No. 7,601,740 ("'740 patent") for Double Patenting (D.I. 260) should be denied and Acadia's cross-motion granted.[1]

## I.      NATURE OF THE PROCEEDINGS

Five generic pharmaceutical manufacturers initially challenged the validity of the '740 patent, which protects the invention of the compound pimavanserin, the active ingredient of Acadia's groundbreaking drug NUPLAZID®.  All except for MSN have ended their challenges. As to MSN, it has one defense that it continues to press—an assertion that Claim 26 of the '740 patent is invalid for obviousness-type double patenting ("OTDP") based on Acadia's U.S. Patent No. 9,566,271 ("'271 patent").  The '271 patent descends from the same application as the '740 patent, and was both filed and issued after the '740 patent.[2]  As discussed below, the '740 patent was and is rightfully granted, and is not subject to double patenting based on the later patent.[3]

## II.     SUMMARY OF ARGUMENT

Acadia owns the '740 and '271 patents.  Acadia first filed the application that issued as the '740 patent.  During the prosecution of that application, the Patent and Trademark Office ("PTO") determined that the claims needed to be divided into more than one application.  Acadia filed additional applications directed to this subject matter.  One of those applications issued later as the '271 patent.  Accordingly, both the '740 and '271 patents trace back to the same effective filing date, but the '271 patent is a later-filed, later-issued patent.  Because the PTO spent more

---

[1] The parties agree that a denial of MSN's motion would result in final judgment in favor of Acadia.  MSN stipulated that its product infringes Claim 26 of the '740 patent.  (D.I. 257.)  The parties stipulated to a specific set of undisputed facts.  (D.I. 258.)  MSN misstates these facts as agreed.  Acadia respectfully refers the Court to D.I. 258 for the actual facts as agreed.
[2] OTDP may be cured with the filing of a "terminal disclaimer" at the PTO.  *See e.g.*, *Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*, 592 F.3d 1340, 1347 (Fed. Cir. 2010) ("[A] patentee may file a disclaimer after issuance of the challenged patent or during litigation, even after a finding that the challenged patent is invalid for obviousness-type double patenting").  Because MSN fails to prove OTDP, Acadia disagrees that any terminal disclaimer is needed.
[3] MSN does not assert that the '271 patent is double patenting based on the '740 patent.

time reviewing the initial application, creating delay in its grant, the PTO granted the '740 patent a statutory patent term adjustment of 980 days under 35 U.S.C. § 154(b) ("PTA").  MSN now attempts to take away that statutory grant using the judge-made OTDP doctrine.  That outcome is inequitable and contrary to applicable law.

Two independent bases compel denial of MSN's motion.  First, the '271 patent cannot be used as an OTDP reference against the '740 patent because the Safe Harbor of 35 U.S.C. § 121 applies.  MSN misinterprets and misapplies § 121 in this situation, where it is challenging an original patent ('740 patent) using a later patent as the reference ('271 patent).

Second, OTDP may not override the PTA of the '740 patent, particularly under the present facts.  OTDP, a judge-made doctrine designed to prevent a patentee from creating an unjustified, time-wise extension of patent exclusivity by filing later applications to obtain later patent grants and later expiration dates, is not applicable under the undisputed facts of this case. Gamesmanship did not, and could not, have occurred in the present case.  This is a straightforward instance of a subsequent patent in the same family ('271) receiving a **_shorter_** term than an earlier-filed and earlier-issued patent ('740)—the opposite of what the OTDP doctrine is intended to prevent—because only the original '740 patent qualified for PTA.

## III.    SUMMARY OF UNDISPUTED FACTS

A timeline of the relevant undisputed facts is included in **Exhibit A**.

### A.    Relevant Patent Filing, PTA, and Expiration Dates

Acadia owns the '740 and '271 patents.  Acadia originally filed U.S. Patent Application No. 10/759,561 ("'561 application") on January 15, 2004, which eventually gave rise to the '740 patent granted on October 13, 2009.  ((D.I. 158), JSUF ¶ 13, 16, 23; JSUF Ex. 2 at 0006, field (21)).  Claim 26 of the '740 patent is directed to the tartrate salt of pimavanserin.  (JSUF ¶ 44).

The '271 patent issued over seven years later, on February 14, 2017, from a series of

applications tracing back to U.S. Patent Application No. 11/416,527 ("'527 application"), filed on May 3, 2006.  The '527 application was a "divisional" from the '561 application because the PTO had "restricted" the '561 application to the compound and not methods of using it.  (JSUF ¶ 16, 25, 33; JSUF Ex. 4).  Claim 5 of the '271 patent is thus directed to a method for treating hallucinations or delusions by administering the tartrate salt of pimavanserin.  (JSUF ¶ 44).

The PTO calculated that it delayed issuance of the initially examined '740 patent and granted 980 days of PTA.  As a result, while the '740 and '271 patents have the same 20-year statutory term under § 154(a)(2) that ends on January 15, 2024, a PTA sets the expiration date of the '740 patent to September 21, 2026.  (JSUF ¶¶ 17, 19-22; JSUF Ex. 8 at 0386-87).  MSN does not challenge the fact that the PTA was properly measured and granted.[4]

### B.      The '561 Application: Relevant Restriction Requirements and Responses

On July 5, 2007, the PTO issued a restriction requirement in the first Office Action for the '561 application, stating that the then-pending claims contained seven groups of "distinct" inventions, Groups I-VII, and requiring the applicant to elect a single group for further prosecution.  (JSUF ¶ 26; JSUF Ex. 5 at 0132).  Group I was compounds and compositions, independent and distinct from the inventions of Groups II-V, directed to methods of using the compounds of Group I.  (JSUF ¶ 26; JSUF Ex. 5 at 0133-35).  Acadia elected to prosecute the inventions of Group I (compounds and compositions) in the '561 application.  (JSUF ¶¶ 27-31).  Acadia pursued its additional inventions in separate applications, including the '527 application filed May 3, 2006.

---

[4] The PTO also granted the '740 patent an additional extension of 1,315 days under 35 U.S.C. § 156 ("PTE") to compensate for FDA delay, which MSN does not challenge in any respect.  *See Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d 1317, 1320 (Fed. Cir. 2007) (discussing the policy bases for PTEs based on FDA delay); *see also Novartis AG v. Ezra Ventures LLC,* 909 F.3d 1367, 1373-75 (Fed. Cir. 2018) ("§ 156 mandates a term extension so long as the other enumerated statutory requirements for a PTE are met").

### C.      The '527 Application:  Relevant Restriction Requirements and Responses

On June 1, 2009, the Examiner issued the first Office Action in the '527 application

requiring an "election of species."  (JSUF ¶ 34; JSUF Ex. 7 at 0298-303).  Acadia responded by

canceling all pending claims and adding new claims that fell within Group IV of the '561

application's July 5, 2007 restriction requirement.  (JSUF ¶¶ 36-37; JSUF Ex. 7 at 0311-12).

Acadia also stated, "Upon entry of the instant amendment, applicants will amend the claim of

priority such that the instant ['527] application will be a divisional of the '561 application."

(JSUF Ex. 7 at 0312).

On January 26, 2010, the PTO allowed the new claims in the '527 application, and on

April 13, 2010, Acadia amended the '527 application's specification pursuant to 37 C.F.R.

§ 1.312, changing the word "continuation" to "divisional" to confirm that it is a divisional of the

'561 application, to which the PTO was previously apprised on July 1, 2009.  (JSUF ¶¶ 38-39;

JSUF Ex. 7 at 0357-59).  The PTO accepted the amendment.  (JSUF ¶ 38).

## IV.      ARGUMENT

### A.      The '740 Patent Is Immune from MSN's Arguments Under 35 U.S.C. § 121

When it applies, 35 U.S.C. § 121 precludes OTDP arguments in litigation ("Safe

Harbor").  "The safe harbor provision arose from difficulties created by restriction requirements

imposed by the [PTO] during examination, followed by double patenting challenges in the

courts. . . .  This conflicting result was recognized as inherently unfair, and the safe harbor was

created to preclude it."  *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1376–77

(Fed. Cir. 2013).  While the Federal Circuit has acknowledged that "[t]he safe harbor provision"

is "not a model of clarity," *see id.*, the Court has nonetheless found its purpose to be apparent,

stating, "the purpose of § 121 . . . [is] to prevent a patentee who divides an application in which a

restriction requirement has been made from risking invalidity due to double patenting," *see*

4

*Boehringer*, 592 F.3d at 1350, 1352 ("The safe harbor is provided to protect an applicant from losing rights when an application is ***divided***") (emphasis added).

Under the language of the statute, the "original application" (or patent issued thereon), which is the application in which the restriction requirement was made, has paramount protection from later filed applications. *See, e.g.*, *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1360, 1362 (Fed. Cir. 2008) ("[S]afe harbor, by its literal terms, protects only 'divisional application[s]' (***or the original application***) and patents issued on such applications . . . [T]he drafters of section 121 chose to refer specifically and only to divisional (***and original***) applications" within the scope of safe harbor protection) (emphasis added). Unlike the cases cited by MSN , where defendants challenged ***descendant*** patents, sometimes using the original patent as the reference, here, MSN is attempting to challenge the validity of a patent issuing from the ***original*** application ('740 patent), using its descendant, a continuation of a divisional ('271 patent), as the OTDP reference patent. Under the Safe Harbor provision, however, a patent which issued on the original application cannot be invalidated for OTDP based on a patent which issued on an application that was filed as a result of a restriction requirement in said original application. This makes sense because a patent owner should at least remain entitled to their first-filed patent when the PTO necessitates later filed applications. MSN's arguments that Safe Harbor does not apply are without merit on the present facts. Thus, MSN cannot use the '271 patent as a reference against the '740 patent.

### 1.     MSN Erroneously Interprets the Requirements for Safe Harbor

MSN argues that "the '271 patent is properly a reference against the '740 patent" (MSN Br. at 13) because the "safe harbor can only apply if (1) the divisional application is 'filed as a result of' the restriction requirement; and (2) the divisional application is filed before the issuance of a patent from the original application" (MSN Br. at 2). But MSN's assertion is not

grounded in the language of the Safe Harbor statute or legal precedent.  MSN appears to approach its analysis from the wrong perspective—where the patent being challenged had issued on a later-filed continuation of a divisional application, and the argument is whether this continuation is properly considered a divisional such that it could receive protection from reference patents under the Safe Harbor.[5]  (*See* MSN Br. at 10 n.3).  Here, the patent being challenged is the original patent, not a continuation of a divisional, and therefore neither of MSN's purported requirements could possibly apply.  As discussed below in IV.A.2, the text of § 121 protects an original patent from all manner of "application[s] filed as a result of such a requirement [for restriction]," *i.e.*, the restriction requirement made in the original application, and does not require the reference patent to specifically issue on a "divisional" application. As such, when the original patent is the one being challenged, there is no requirement under the Safe Harbor that a divisional be filed at all, let alone before the issuance of the original patent.

## 2. The Correct Requirements for Safe Harbor

The Safe Harbor statute is complex and has several potential permutations of requirements to invoke Safe Harbor, depending on what type of patent is being used as a reference patent and what type is being challenged.  35 U.S.C. § 121 provides that:

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions.  If the other invention is made the subject of a divisional application which complies with the requirements of section 120 it shall be entitled to the benefit of the filing date of the original application.  **A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and**

---

[5] MSN mistakenly treats the '271 patent as if it is being afforded protection, exemplified by its citation to *Symbol*.  (MSN Br. at 10 n.3) (Asserting "[t]he '271 patent issued from a string of seven continuation applications that trace back to the '527 application . . . The prosecution of continuation applications of a divisional application is considered part of the prosecution of the divisional application, for the purpose of applying OTDP.  *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1579 (Fed. Cir. 1991) . . . . Of course, if the 'divisional' does not receive § 121 safe harbor treatment, continuations from that divisional do not either").

> **Trademark Office or in the courts** <u>against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.</u>

35 U.S.C. § 121 (emphasis added).

The third sentence of § 121 contains the Safe Harbor provision.  In order to better explain the operation of this sentence, we have broken it into two parts: **bolded** and <u>underlined</u>.  The **bolded** part identifies two types of patents that "shall not be used as a reference either in the Patent and Trademark Office or in the courts" (reference patents): (1) "a patent issuing on an application with respect to which a requirement for restriction under this section has been made" or (2) "a patent issuing . . . on an application filed as a result of such a requirement."[6]  Since MSN has identified the '271 patent as the reference patent, only type (2) is relevant here: "**A patent issuing . . . on an application filed as a result of a restriction requirement shall not be used as a reference either in the Patent and Trademark Office or in the courts . . . .**"

The <u>underlined</u> part of the sentence describes patents/applications that are being challenged:  (a) "divisional application[s]" and any patents issuing on them, and (b) "original application[s]" and any patents issuing on them.  Taken with the relevant **bold** language from type (2), we can see how this <u>underlined</u> language applies to divisional patents by omitting the language specific to original applications/patents, and *vice versa*, as follows:

---

[6] Section 121 uses the phrase "on an application" for both type (1) and (2) reference patents, and does not specify that type (2) must be "a divisional application."  In fact, type (1) clearly cannot require "an application" to be "a divisional application" because it encapsulates the "original application," thus under the presumption of consistent usage, type (2) also cannot be restricted to only "divisional applications" either.  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[T]he normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning").

**(a)** Protection of a **<u>Divisional</u>** Application from OTDP Arguments Based on Type 2 Reference Patents

> **A patent issuing . . . on an application filed as a result a restriction requirement shall not be used as a reference either in the Patent and Trademark Office or in the courts** <u>against a divisional application . . . or any patent issued on [it], if the divisional application is filed before the issuance of the patent on the other application</u>

**(b)** Protection of the **<u>Original</u>** Application from OTDP Arguments Based on Type 2 Reference Patents

> **A patent issuing . . . on an application filed as a result of a restriction requirement shall not be used as a reference either in the Patent and Trademark Office or in the courts** . . . <u>against the original application or any patent issued on [it]</u> . . .

Here, the language of (b) applies, not (a), because MSN is attempting to challenge the validity of the '740 patent, which is the patent issuing on the ***original*** application. Appropriately inserting the '271 and '740 patents into the language of (b) results in the following requirements for Safe Harbor to apply in this case: if the '271 patent issued on an application filed as a result of a restriction requirement in the '740 patent, the '271 patent shall not be used as a reference in the courts against the '740 patent.

### 3.    Safe Harbor Applies in this Case

The '271 patent was filed "as a result of" a restriction requirement in the '740 patent, thus Safe Harbor applies. The "as a result of" requirement is met simply when (1) "[t]he [descendant] application was 'due to the administrative requirements imposed by the [PTO]' . . . in the sense that, absent the restriction requirement, the applicant could have retained in the [original] application . . . the claims prosecuted in the [descendant] application," and (2) consonance is maintained. *Boehringer*, 592 F.3d at 1353 n.3, 1353-54. Here, the '271 patent issued on U.S. Patent Application No. 14/935,246 ("'246 application"), which descends from the original '561 application. (JSUF ¶ 21). The '246 application meets the "as a result of" requirements because

(1) the claims of the '246 application (descendant) are directed to methods of use of pimavanserin (Group IV inventions) that could have been retained in the '561 application (original) *absent the 2007 restriction requirement* (which identified 7 distinct groups of inventions) and (2) consonance with the 2007 restriction requirement was maintained.[7]  These facts are not in dispute.  (JSUF ¶¶ 26, 44).  Thus, Safe Harbor applies.

### 4. The Facts Here Also Meet MSN's Incorrect "Requirements"

Even if both of MSN's purported requirements applied, § 121 would still apply.

### a) MSN's First Requirement Is Met: The '527 Application Was Filed "as a Result of" the '561 Application Restriction

MSN argues that the "as a result of" requirement in § 121 is not met because "[t]he '527 Application that led to the '271 patent was voluntarily filed as a continuation application in May 2006, more than one year *before* the first restriction requirement was placed on the original '561 Application," and thus "could not have been filed *as a result of* the July 2007 restriction requirement."  (MSN Br. at 10-11).  As discussed below, such argument is contrary to law.

Although the '527 application was initially filed before the July 2007 restriction requirement, Acadia amended the '527 application on July 1, 2009, consistent with the restriction requirement in the original '561 application before a patent issued on the '527 application.  This included cancelling all previously pending claims and specifically noting that Acadia was adding new claims "within group IV (claims 40-47) of the Restriction Requirement dated July 5, 2007 in the '561 Application."  (JSUF ¶¶ 36-37).

---

[7] The restriction requirement identified seven separate inventions in the '561 application.  In relevant part, Group IV (Claims 40-47) were "drawn to a method for treating a neuropsychiatric disease, classified in class 514, subclass 653."  (JSUF ¶ 26).  This is consonant with (*i.e.*, consistent with) the restriction.  *Boehringer*, 592 F.3d at 1354 ("[C]onsonance requires that the line of demarcation between the 'independent and distinct inventions' that prompted the restriction requirement be maintained").

In *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036 (D. Del. 1985), the court found the "as a result of" requirement was met when the second-filed application was filed *before* the entrance of the relevant restriction requirement in the first-filed, original application. In *Union Carbide*, the Safe Harbor applied to a second-filed application (Stamberger III application) that had initially been identified as a non-divisional application *prior to the restriction requirement* in the original application (Stamberger II application), and which was later amended to comport with the restriction requirement prior to the issuance of the patent.  *Id.* at 1059-60.  In relevant part, the court explained:

> There is no question that Stamberger III was 'filed,' in the sense that an application was placed on record with the PTO and an application number assigned, before restriction of Stamberger II was ordered.   Following restriction, however, the pending claims of Stamberger III were cancelled in their entirety and new claims were added to reflect those deleted from Stamberger II because of the PTO requirement.   With the filing of the Stamberger III amendment, the PTO was apprised that such action was taken pursuant to the office's requirement for restriction.  **Where, as here, the claims of an application are amended in toto to reflect the division of a copending application, I conclude that the amended application is one 'filed as a result of such a requirement' as set forth in section 121.  No practical distinction exists between an application filed for the first time as a result of a restriction requirement, and an application which is amended in full to comport with that requirement.**  I am therefore not convinced that section 121 was intended to include only the former and decline to limit the statute's application based on a formalistic rule.

*Id*. (emphasis added).  Similarly, in the present case, the claims of the previously filed '527 application were amended *in toto* to reflect the division (restriction requirement) of the co-pending '561 application after the restriction requirement was made.

In *Boehringer*, consistent with *Union Carbide*, the Federal Circuit found that "the choice of how to prosecute non-elected inventions [following a restriction requirement] is up to the applicant and is constrained neither by the terms of an examiner's restriction requirement nor by the language of § 121." *Boehringer*, 592 F.3d at 1352-54 (holding two serially-filed divisional applications met the "as a result of" requirement, despite not complying with the requirements of

§ 121 for part of prosecution). *Boehringer* further emphasized that "[s]ection 121 is not concerned with . . . how any [particular divisional] applications are filed. To prevent loss of the safe harbor in dividing out claims to non-elected inventions, what is required is consonance with the restriction requirement." *Id*. at 1353-54. Thus, "inquiry into whether the Safe Harbor rule applies requires analysis of the ***issued*** claims" and not the path to those claims. *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 412-13 (D.N.J. 2019), *aff'd,* 964 F.3d 1049 (Fed. Cir. 2020) (emphasis added) (citing *Boehringer* and holding "[t]he USPTO allows application amendments at any time and does not provide temporal limits for the Safe Harbor provision to apply" while providing Safe Harbor protection to an application that was amended to maintain consonance ten years after the application was originally filed).

*Union Carbide* and *Boehringer* demonstrate that—contrary to MSN's position—an application does not have to be filed *directly* "as a result of" a restriction requirement because intervening steps are allowed.[8]  Indeed, under these cases, an application can be filed before the restriction requirement in the original application if the claims are subsequently amended to comport with the restriction requirement.

### b) MSN's Second Requirement Is Met: The '527 Application Was Filed Before the '740 Patent Issued

MSN argues that because "the '740 patent, had issued six months before Acadia's [April 13, 2010] 'change of status' amendment on the '527 application," that "such an amendment

---

[8] MSN cites to *G.D. Searle LLC v. Lupin Pharms., Inc.*, 790 F.3d 1349 (Fed. Cir. 2015) and *In re Janssen Biotech, Inc.*, 880 F.3d 1315 (Fed. Cir. 2018), but they do not apply here. (MSN. Br. at 8, 9, 12.)  In both cases, the Federal Circuit rejected attempts by patentees to re-designate challenged ***continuation-in-part*** patents as divisionals, ***years after those challenged patents issued***, because the patentees had already enjoyed the benefit of claiming new subject matter through a continuation-in-part at the public's expense. *See Janssen*, 880 F.3d at 1323. The instant case does not involve a continuation-in-part application or re-designating the challenged '740 patent after issuance.

outside of the safe harbor window . . . does not, and cannot, trigger the safe harbor protection against OTDP."  (MSN Br. at 12).  Even if MSN were right that in order to protect the '740 patent from the '271 patent, the '527 application, as the first divisional, needed to be filed prior to the issuance of the '740 patent, Acadia would also meet that requirement.[9]  Per 35 U.S.C. § 111(a)(4), "[t]he filing date of an application shall be the date on which a specification, with or without claims, is received in the United States Patent and Trademark Office."  The '527 application was filed on May 3, 2006, before the '740 patent issued (JSUF ¶ 21), and the PTO accepted Acadia's amendment as timely re-designating the '527 application as a divisional.  In addition, Acadia also stated its intent to re-designate to a divisional upon the PTO's acceptance of the amended claims before the '740 patent issued.  (JSUF ¶¶ 36-37; JSUF Ex. 7 at 0311-12).

There is no provision in the patent laws for a different filing date to be accorded if a continuation application is reclassified as a divisional application before the issuance of that application.  Consistent with 35 U.S.C. § 111(a)(4), the PTO identified the '527 application as a divisional application and accorded it a May 3, 2006 filing date.  (JSUF Ex. 3 at 0035 ("filed on May 3, 2006, now Pat. No. 7,732,462, which is a division of application No. 10/759,561")).

The PTO made a procedural determination of filing date consistent with the applicable statute.  *Id.*  MSN has not challenged the PTO's determination nor is there any viable avenue for MSN to do so.  *See*, *e.g.*, *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 543 F.3d 657,

---

[9] Such a holding would be illogical, however, as the Federal Circuit noted, "§ 121 refers broadly to 'a divisional application,' and does not state that the divisional must be a direct divisional of the original application.  Had Congress intended to limit the safe harbor only to a divisional of the application in which the restriction requirement was entered, it could have said 'a divisional application of the original application,' rather than simply 'a divisional application.'" *Boehringer*, 592 F.3d at 1351.  Likewise, § 121 states "if *the divisional application* is filed before the issuance of the patent on the *other* application" not "if *the first divisional application* is filed before the issuance of the patent on the *original* application."  35 U.S.C. § 121.

663 (Fed. Cir. 2008) (declining review of procedural decision in connection with invalidity analysis because "[i]f any prosecution irregularity or procedural lapse, however minor, became grist for a later assertion of invalidity, accused infringers would inundate the courts with arguments relating to every minor transgression they could comb from the file wrapper").  Thus, even if there was a timing requirement for filing a divisional under § 121, it has been met here.

### B.      Even If MSN Could Argue OTDP Applies, Despite 35 U.S.C. § 121, the Argument Still Fails as a Matter of Law

MSN's attack on the '740 patent is an attack on the effect of the PTA awarded to the '740 patent.  But the PTA was granted as a matter of statutory right, *see* 35 U.S.C. § 154(a)(2), and OTDP is a judge-made doctrine.  Case law does not support MSN's use of OTDP in this case.  Nor could it because it would need to override the proper statutory grant applicable in this case.

The "judicially-created doctrine of"  OTDP prohibits "a party from obtaining an extension of the right to exclude through claims in a *later* patent that are not patentably distinct from claims in a commonly owned *earlier* patent."  *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001) (emphases added).  "[T]he fundamental reason for the rule [of OTDP] is to prevent *unjustified* timewise extension of the right to exclude granted by a patent no matter how the extension is brought about."  *Id*. at 968 (emphasis added); *see In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (purpose of OTDP is "to prevent *unjustified* timewise extension of the right to exclude") (emphasis added).

Permitting OTDP to apply in this case would contravene the above-stated principles.  MSN seeks to use the later filed of two patents ('271) to invalidate the earlier filed ('740).  But by definition, because the filing of the application resulting in the '740 patent was the original application, Acadia did not and could not have filed the '740 patent to "exten[d its] right to exclude" past the later filed, later issued '271 patent's expiration date.  There is therefore nothing

13

even potentially "unjustified" about the fact that, due to a statutorily mandated PTA owing to **examiner delay**, Acadia's "right to exclude" based on the '740 patent extends to 2026.[10]

### 1.    Precedent Demonstrates that OTDP Cannot Be Based on PTA

The Federal Circuit's decision in *Novartis AG v. Ezra Ventures LLC,* 909 F.3d 1367 (Fed. Cir. 2018) ("*Ezra*") and subsequent decisions discussed below compel the rejection of MSN's motion.  *Ezra* held that OTDP does not invalidate a patent with a validly obtained statutory patent term extension in the form of a PTE.  *Id.* at 1369.  The Federal Circuit interpreted 35 U.S.C. § 156 and found that the plain meaning of the statute did not raise issues of unjustified patent extension that invoked double patenting concerns.  *Id*. at 1372-73.  Instead, the court explained that §156 "was enacted to restore the value of the patent term that a patent owner loses during the early years of the patent because the product cannot be commercially marketed without [FDA] approval."  *Id*.  It held that OTDP could not be used to nullify a PTE, "recogniz[ing] that a straightforward reading of § 156 mandates a term extension so long as the other enumerated statutory requirements for a PTE are met."  *Id*. at 1373.  Thus, the court refused to employ "a judge-made doctrine [to] cut off a ***statutorily-authorized time extension***."  *Id*. at 1375 (emphasis added).

In so holding, the Federal Circuit noted that where it is "the earlier-filed, earlier-issued '229 patent, not the later-filed, later-issued '565 patent, that has the later expiration date, due to a statutorily-allowed term extension under § 156" (PTE), "the traditional concern with [OTDP]" is absent, and "there is no potential gamesmanship issue through structuring of priority claims as identified in *Gilead* [*Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208 (Fed. Cir. 2014)]."  *Id*. at 1374-75.  Likewise, in the present case, the earlier-filed, earlier-issued '740 patent, not the later-

---

[10] As noted above, the '740 patent also has a PTE under 35 U.S.C. § 156, which is not subject to challenge by MSN.

filed, later-issued '271 patent, has the later expiration date.  Thus, the traditional concern of OTDP is absent here and OTDP should not apply.

The Federal Circuit also affirmed the principle that OTDP may not operate to countermand the will of the legislature in *Novartis Pharms. Corp. v. Breckenridge Pharms. Inc*., 909 F.3d 1355 (Fed. Cir. 2018) ("*Breckenridge*"), decided the same day as *Ezra*.  *Breckenridge* concerned two patents with a shared priority date: the later-filed, later-issued patent, which was under the Uruguay Round Agreements Act ("URAA") and thus governed by priority date, expired before the earlier-filed, earlier-issued pre-URAA patent.  *Breckenridge*, F.3d 1355 at 1357-58.  In declining to allow the later-filed, later-issued, but earlier-expiring patent to serve as an OTDP reference patent, the Federal Circuit s explained that it would "***not truncate the term statutorily assigned*** to the pre-URAA [] patent" with the OTDP doctrine.  *Id.* (emphasis added).

Since the *Ezra* decision, the only two district court decisions to address the applicability of OTDP to PTA have determined that PTA, like PTE, must be shielded from OTDP.  In *Mitsubishi Tanabe Pharma Corp. v. Sandoz, Inc*., the challenged patent and reference patent claimed priority to the same application, but—like the present case—the challenged patent expired later solely due to PTA.  533 F. Supp. 3d 170, 211-12 (D.N.J. 2021).  Relying on OTDP guidance from *Gilead* through *Ezra*, the court determined that "the granting of a PTA does not present the potential for gamesmanship by inventors to secure a second, later-expiring patent for the same invention."  *Id*.  The court emphasized, "[p]erhaps more importantly, however, the [c]ourt is swayed by the Federal Circuit's observation that '***a judge made doctrine' should not be used to 'cut off a statutorily-authorized time extension***.'"  *Id*. at 214 (emphasis added).

Similarly, in *Amgen, Inc. v. Sandoz Inc.*, the challenged patent expired later due to receiving PTA (and also PTE).  No. 18-11026 (MAS) (DEA), 2021 WL 5366800 (D.N.J. Sept.

15

20, 2021), at *26-27.  The *Amgen* court, applying *Ezra* and considering the equities, found that

PTA and PTE statutory term restorations could not create a basis for OTDP: "[a] difference in

expiration dates between two patents that arises solely from a statutorily authorized time

extension, such as a patent-term adjustment pursuant to 35 U.S.C. § 154(b) or a patent-term

extension pursuant to 35 U.S.C. § 156, cannot be the basis for an application of [OTDP]."  *Id*. at

*26-27.  The above precedent is clear and squarely controlling of this case.[11]

### 2.     Cases Cited by MSN Are Inapposite

MSN cites *Gilead* (MSN Br. at 6-7), but *Gilead* dealt with two similar patents that were

"not part of the same family of patents and were not before the same patent examiner."  *Gilead*,

753 F.3d at 1210.  Instead, the patentee "crafted a separate 'chain' of applications [with] a later

priority date" such that "the patents do not claim priority to any common application" and

therefore "will expire at different times as governed by the provisions of the Uruguay Rounds

Agreement Act."  *Id*. at 1210.  These applications were also examined by different examiners.

*Id*.  *Gilead* presented the "narrow question" of "can a patent that issues after but expires before

another patent qualify as a double patenting reference for that other patent," to which the Federal

Circuit concluded that only under the narrow "circumstances of this case" was OTDP an

available infringement defense.  *Id*. at 1211-12.  Moreover, *Gilead* specifically noted that

statutory term extensions were not at issue in the case.  *Id.* at 1215 n.6; *see Ezra*, 909 F.3d at

1374 n.2 ("The effect of statutory term extensions was expressly not considered in *Gilead*").

---

[11] Acadia notes that the Federal Circuit is currently considering an appeal from a Patent Trial and Appeal Board ("PTAB") decision involving facts different from the present case.  *In re Cellect, LLC* (No. 2022-1292 (Fed. Cir.)).  Oral argument in the appeal took place on June 9, 2023.  The underlying PTAB decision found that OTDP could apply to PTA in a matter where the challenged patent is the second one to issue and has a longer patent term than the original patent, the opposite of the facts in the instant case.  *Ex Parte Cellect, LLC*, Appeal No. 2021-5046, 2021 WL 5755316 (PTAB Dec. 1, 2021).

Nor does *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 746 F.3d 1366 (Fed. Cir. 2014), decided before *Ezra*, help MSN.  (MSN Br. at 6-7, 16, 18).  As with *Gilead*, no part of the *Abbvie* holding reached the question of whether a later-filed, later-issued patent could be used as an invalidating OTDP reference to cut short the term of an earlier-filed, earlier-issued patent that expired later solely due to a statutory PTA.[12]   In fact, the Federal Circuit distinguished *Abbvie* in *Ezra* because a PTE raised "no concern that [patent owner], once its [] patent issued, sought to subsequently 'secur[e] a second, later expiring patent for the same invention,' as in *AbbVie* . . . ."  *Ezra*, 909 F.3d at 1375 (quoting *Abbvie*, 764 F.3d at 1373).

Finally, the Western District of Michigan's decision in *Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, Nos. 12-0654; 13-0324, 2015 WL 11430786 (W.D. Mich. Dec. 10, 2015) is not controlling or persuasive authority.[13]  First, the case issued before the court in *Ezra* refused to allow a judge-made doctrine to cut off a statutorily authorized time extension.  Further, the facts in *Magna* were distinct from this case—for example, there was no restriction requirement and the patents at issue were examined by different examiners during original prosecution, such that it was "not even clear that the primary examiner was aware of the [other patent's] claims."  *Magna*, 2015 WL 11430786, at *3.

> **3.     Contrary to its Assertions, MSN's Use of OTDP Against the '740 Patent is Not Grounded in any Relevant Statute and Is Without Merit**
>
>> **a)   The PTA Statute Is Unambiguous and Enumerates the Only Reasons a PTA May Be Denied or Shortened**

---

[12] In *Abbvie*, the patentee proposed that OTDP had been foreclosed by the enactment of the URAA (which, in part, changed the term of a patent to twenty years from the filing date of the patent application).  *Abbvie*, 746 F.3d at 1373-1374. The Federal Circuit disagreed and reaffirmed that OTDP remained viable in certain circumstances as per *Gilead*.

[13] MSN states "[a]t least one federal district court has held that OTDP operates to cut off extra patent term due to a PTA" and references *Magna*.  (MSN Br. at 16).  *Magna*, however, is the only district court to reach this conclusion, and, as discussed above, was decided before *Ezra*.

Congress acted to "[g]uarantee" patent terms, 35 U.S.C. § 154(b)(1)(A), by mandating the PTO adjust them in enumerated circumstances ***where delay was the PTO's fault***.  Congress provided that a patent for any subject matter "***shall be extended***" one day for each day of delay in prosecution that is attributable solely to the PTO, through no fault of the patent owner. 35 U.S.C. § 154(b)(1)(A) (emphasis added); *accord Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d 1317, 1322 (Fed. Cir. 2007) ("Use of the word 'shall' in a statute generally denotes the imperative.").

MSN fails to acknowledge that § 154 identifies only three "[l]imitations" on PTA: it "shall not exceed the actual number of days the issuance of the patent was delayed" in cases where there are overlapping grounds for adjustment ((b)(2)(A)), "[n]o patent the term of which has been disclaimed beyond a specified date may be adjusted under this section beyond the expiration date specified in the disclaimer," ((b)(2)(B)), and PTAs are "reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application" ((b)(2)(C)).  As a result, the statute provides a regime of mandatory compensation for delays caused solely by the PTO (as long as not double-counted), alterable ***only*** for a specifically enumerated list of actions, or failures to act, on the part of applicants.  *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1576 (Fed. Cir. 1995) ("inclusion of [specific] exception[s] . . . implies the exclusion of any others").  OTDP, which is premised on actions taken by a patentee, is not on the list of enumerated actions that can alter a mandatory PTA.[14]

---

[14] PTE, which cannot trigger OTDP, has similar mandatory language and limitations, thus providing another basis for treating PTA and PTE the same for OTDP purposes.  *See* 35 U.S.C. §§ 156(c), 156(g)(6).  If there are multiple patents involved in the same regulatory review period for a given product, a patent owner must choose only one patent for a PTE.  *Id.* at § 156(c)(4).

The legislative history buttresses the statutory language's clear indication that identifying the party at fault is crucial to this regime's operation. *See* H.R. REP. 106-287 (Aug. 3, 1999) at 48-9 ("Title III amends the provisions in the Patent Act that compensate patent applicants for certain reductions in patent term that are not the ***fault*** of the applicant . . . Only those who ***purposely manipulate the system*** to delay the issuance of their patents will be penalized under Title III." (emphases added)).  Thus, Congress envisioned applicant fault as the sole ground for which a patentee would not be assured a 17-year-term floor.  Here, Acadia was a non-dilatory applicant, and the misapplication of OTDP would truncate the term of the '740 patent.

### b)   Congress Did Not Implicitly Approve Applying OTDP to PTAs

MSN asserts that OTDP "has been recognized, addressed, and shaped, by statutes" and that "Congress repeatedly addressed and authorized the OTDP doctrine" to argue that OTDP can apply against PTA.  (MSN Br. at 13-14).  MSN's arguments miss the point—a ***judge-made*** doctrine with acknowledgement from Congress cannot override a statutorily mandated extension. *See U.S. v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (court may not use its equitable powers to "override Congress' policy choice, articulated in a statute"); *Ezra,* 909 F.3d at 1375.  While these statutes may have some interaction with and provide non-exclusive remedies for OTDP, OTDP is not derived from, or protected by, statute.

MSN also argues that OTDP must apply to PTA because the Safe Harbor of §121 now only applies to PTA under § 154(b).  (MSN Br. at 17-18).  MSN's circular argument is without merit.  Section 121 does not by its terms purport to be the exclusive way for a patentee to avoid OTDP.  As shown by *Ezra*, *Mitsubishi Tanabe*, and *Amgen*, courts have the power to decide when this judge-made, equitable doctrine is applicable.  Moreover, the role of OTDP (although still relevant), and thus § 121 in connection with OTDP, has gradually reduced over time.  *See Abbvie*, 764 F.3d at 1373-74 ("the doctrine of [OTDP] is less significant in post-URAA patent

disputes"); *Boehringer*, 592 F.3d at 1346 (noting the "purpose" of OTDP may be limited to pre-URAA patents).

Next, as MSN notes, PTEs were then "placed outside of the power of OTDP" by *Ezra*. (MSN Br. at 17).  And the *Mitsubishi Tanabe* and *Amgen* courts have done the same with PTA. These decisions on PTE and PTA are not erroneous extensions of judicial power effectively abrogating § 121, but are instead an appropriate upholding of congressional intent to provide statutory protection of PTA.  Section 121 remains as law.  And, while its extent of use may have become gradually more limited over time through the enactment of URAA and then subsequent court decisions on PTE and PTA, Acadia is not aware of (and MSN does not cite) any legal principles precluding a court from providing exceptions to judge-made doctrines in order to maintain a certain level of use for a statue that provides a non-exclusive remedy for that doctrine.

In asserting there is a presumption that Congress "legislate[s] against the backdrop of existing law," MSN implies that because Congress discussed OTDP when reviewing the CREATE Act, it is somehow relevant to the current issue.  (MSN Br. at 15).  The Congressional Record cited by MSN, however, makes no mention of PTA or PTE.  *See* 150 Cong. Rec. S7521 (June 25, 2004).  The fact that Congress included a terminal disclaimer limitation in the PTA statute itself demonstrates that it was legislating against a backdrop of existing law and made specific decisions on the limits and exceptions it wanted to impose for PTA.  *See* 35 U.S.C. § 154(b)(2)(B).  In sum, nothing in the statutes relied upon by MSN prohibit courts from granting a PTA exception to OTDP.

## V.      CONCLUSION

For the foregoing reasons, Acadia respectfully requests denial of MSN's motion and grant of Acadia's cross motion, submitted herewith.

Dated: June 14, 2023

**SAUL EWING LLP**

OF COUNSEL:

Chad J. Peterman
Bruce M. Wexler
Scott F. Peachman
Rebecca A. Hilgar
Felix A. Eyzaguirre
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
chadpeterman@paulhastings.com
brucewexler@paulhastings.com
scottpeachman@paulhastings.com
rebeccahilgar@paulhastings.com
felixeyzaguirre@paulhastings.com

*/s/ Michelle C. Streifthau-Livizos*
James D. Taylor, Jr. (#4009)
Jessica M. Jones (#6246)
Michelle C. Streifthau-Livizos (#6584)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, Delaware 19899
(302) 421-6800
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

*Attorneys for Plaintiff*
*ACADIA Pharmaceuticals Inc.*